UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

A & R ENGINEERING AND TESTING, INC.,

       Plaintiff,

   vs.

CITY OF HOUSTON; and

KEN PAXTON, in his official capacity as Attorney General of Texas,

       Defendants.

Case No.  4:21-cv-03577

**A&R'S OPPOSITION TO TEXAS'S MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................... ii

INDEX OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................1

ARGUMENT....................................................................................................................2

    I.    The Anti-BDS Law is an unconstitutional restriction of free expression. ..............2

        A. *Claiborne*, not *FAIR*, applies in this case. ......................................................2

        B. *Longshoremen* does not apply. ......................................................................4

        C. O'Brien and Jaycees do not apply. .................................................................4

    II.    The Anti-BDS law is an unconstitutional compulsion of speech. .........................6

    III.  The law is unconstitutionally vague and overbroad.............................................7

        A. Canons of construction cannot save the Anti-BDS law's amorphous nature. ..................7

        B. A&R may make a facial challenge to the Anti-BDS Law's vagueness and overbreadth. .10

    IV.  The First Amendment applies to government contracts.....................................11

    V.    A&R may obtain an injunction on behalf of others. ..........................................12

CONCLUSION................................................................................................................14

## INDEX OF AUTHORITIES

### Cases

*AID v. All. for Open Socy. Intern., Inc.,*
  570 U.S. 205 (2013) ....................................................................................................... 11

*Amawi v. Pflugerville,*
  373 F. Supp. 3d 717 (W.D. Tex. 2019) ............................................................... passim

*Arkansas Times LP v. Waldrip,*
  362 F. Supp. 3d 617 (E.D. Ark. 2019) ................................................................... 1, 8

*Baird v. State Bar of Ariz.,*
  401 U.S. 1 (1971) ............................................................................................................ 6

*Bd. of Ancient Order of Hibernians v. Dinkins,*
  814 F. Supp. 358 (S.D.N.Y. 1993) ............................................................................. 5

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) ............................................................................................ 9, 10, 13

*Brown v. Ent't Merchants Ass'n,*
  564 U.S. 786 (2011) ....................................................................................................... 7

*Cole v. Richardson,*
  405 U.S. 676 (1972) ....................................................................................................... 6

*FTC v. Superior Court Trial Lawyers Association,*
  493 U.S. 411 (1990) ....................................................................................................... 3

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
  515 U.S. 557 (1995) ....................................................................................................... 5

*Inclusive Communities Project, Inc. v. Texas Dept. of Hous. and Community Affairs,*
  2012 WL 3201401 (N.D. Tex. Aug. 7, 2012) ....................................................... 12

*International Longshoreman's Association v. Allied International, Inc.,*
  456 U.S. 212 (1982) ................................................................................................... 3, 4

*Intl. Women's Day March Plan. Comm. v. City of San Antonio,*
  619 F.3d 346 (5th Cir. 2010) .................................................................................... 10

*Invisible Empire of the KKK v. Thurmont,*
  700 F. Supp. 281 (D. Md. 1988) ................................................................................ 5

*Jordahl v. Brnovich,*
  336 F. Supp. 3d 1016 (D. Ariz. 2018) ............................................... 1, 2-4, 11, 14

*Koontz v. Watson,*
  283 F. Supp. 3d 1007 (D. Kan. 2018) .................................................................. 1, 14

*Martin v. Wrigley,*
  --- F. Supp. 3d ----, 2021 WL 2068261 (N.D. Ga. May 21, 2021) ................ 1, 8

*NAACP v. Claiborne Hardware Co.,*
  458 U.S. 886 (1982) ................................................................................................ 2, 4, 6

*New York County Bd. Of Ancient Or. Of Hibernians v. Dinkins,*
  814 F. Supp. 358 (S.D.N.Y. 1993) ........................................................................... 10

*Pickering v. Bd. of Ed.,*
  391 U.S. 563 (1968) ..................................................................................................... 11

*Pierce v. Socy. of the Sisters of the Holy Names of Jesus and Mary,*

268 U.S. 510 (1925) .............................................................................................12

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) ..............................................................................................5

*Roberts v. U.S. Jaycees,*
468 U.S. 609 (1984) ...........................................................................................4, 5

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
141 S. Ct. 63 (2020) ............................................................................................12

*Rumsfeld v. FAIR,*
547 U.S. 47 (2006) ........................................................................................ 2, 3, 6

*Rust v. Sullivan,*
500 U.S. 173 (1991) ............................................................................................11

*SEIU v. City of Houston,*
595 F.3d 588 (5th Cir.2010) ...............................................................................11

*Texas v. Johnson,*
491 U.S. 397 (1989) ..............................................................................................5

*Texas v. U.S.,*
809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ...............................13

*United States v. O'Brien,*
391 U.S. 367, (1968) .............................................................................................5

*United States v. Simms,*
914 F.3d 229 (4th Cir. 2019)................................................................................7

*United States v. Stevens,*
559 U.S. 460 (2010) ............................................................................................13

*Wabaunsee County v. Umbehr,*
518 U.S. 668 (1996) ............................................................................................11

*Walker v. Sons of Confederate Veterans, Inc.,*
135 S. Ct. 2239 (2015)........................................................................................11

## Statutes

Tex. Gov't Code § 2270.002 ...............................................................................3, 6
Tex. Gov't Code § 808.001 ....................................................................................6

## Other Authorities

Amanda McCaffrey, *Airbnb's Listings in Disputed Territories: A Tortured Compromise,*
JUST SECURITY (July 29, 2019) .............................................................................9

Drew Berry, Ben & Jerry's, *Unilever added to Texas list of companies boycotting Israel,*
KVUE (Sept. 23, 2021) ..........................................................................................9

Elizabeth Findell, *In pro-Israel move, Texas books boycott of Airbnb,*
AUSTIN AMERICAN STATESMAN (Mar. 11, 2019) ..................................................9

Mila Sohoni, *The Lost History of the "Universal" Injunction,*
133 HARV. L. REV. 920, 958-74 (2020)...............................................................12

## INTRODUCTION

If at first you don't succeed, try, try again.

When Bahia Amawi, John Pluecker, and others challenged Texas's Anti-BDS law prohibiting those who engage in boycotts of Israel from entering into any state or local government contracts, Texas made mostly the same arguments in defense of the law it makes here. The District Court there rejected those arguments, just as it should do here. When Texas lost *Amawi v. Pflugerville*, 373 F. Supp. 3d 717 (W.D. Tex. 2019), its response was to amend the law to exclude the plaintiffs from that case, mooting the case. Since A&R Engineering and others remain covered by the amended Anti-BDS Law, that only delayed the inevitable reckoning.

At least Texas is in good company. Kansas, Arizona, Arkansas, and Georgia each have also had their Anti-BDS Laws challenged. So far, every Court but one has held the Anti-BDS law in question unconstitutional.[1] And that one outlier district court opinion was reversed by a panel of the Eighth Circuit.[2]

So, perhaps understandably, Texas prefers to argue on a blank slate. Texas does not cite or attempt to rebut any of the prior Anti-BDS decisions. While those decisions are not binding on this Court, they carry the weight of bipartisan wisdom. Likewise, Texas barely deigns to respond specifically to any of the arguments made by either A&R Engineering in its Motion for a Preliminary Injunction or by prior parties in the other cases.

---

[1] *Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018); *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018); *Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d 617 (E.D. Ark. 2019), *rev'd and remanded*, 988 F.3d 453 (8th Cir. 2021), *reh'g en banc granted, opinion vacated* (June 10, 2021); *Martin v. Wrigley*, --- F. Supp. 3d ----, 2021 WL 2068261 (N.D. Ga. May 21, 2021) (attached hereto as Exhibit 1).
[2] The Eighth Circuit case is currently awaiting a decision on rehearing en banc.

Despite Texas's efforts, there is no need here to recreate the wheel. This Court should adopt the reasoning of the other courts that have found Anti-BDS law's like the one here (in *Amawi*, basically the same exact law) unconstitutional.  As a result, this Court should deny the Motion to Dismiss.

In opposing this Motion, to reduce duplicative briefing, A&R adopts the facts and analysis in its Motion for a Preliminary Injunction, its Reply in Support of a Preliminary Injunction, and the District Court decision in *Amawi,* 373 F. Supp. 3d 717.

**ARGUMENT**[3]

I.   **The Anti-BDS Law is an unconstitutional restriction of free expression.**

    A.   ***Claiborne*, not *FAIR*, applies in this case.**

Like in *Amawi*, 373 F. Supp. 3d 717, Texas's primary argument (at 10-11 and 14-15) is that *FAIR* controls instead of *Claiborne*. As explained by *Amawi* (as well as the district courts in *Koontz*, 283 F. Supp. 3d at 1023-24, and *Jordahl*, 336 F. Supp. 3d at 1042- 43) this case is controlled by *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), and not *Rumsfeld v. FAIR*, 547 U.S. 47 (2006). *Amawi*, 373 F. Supp. 3d 717, 743-45. "*Claiborne* deals with political boycotts; *FAIR*, in contrast, is not about boycotts at all." *Id.* at 743.

In *FAIR*, "[t]he Supreme Court did not treat the *FAIR* plaintiffs' conduct as a boycott: the word 'boycott' appears nowhere in the opinion, the decision to withhold patronage is not implicated, and *Claiborne*, the key decision recognizing that the First Amendment protects political boycotts, is not discussed." *Id.* (footnote omitted). Also in *FAIR*, "'[t]he conduct

---

[3] The facts in this case are already set forth in A&R's Motion for a Preliminary Injunction. Dkt. 7-2 at 2-5.

regulated by the Solomon Amendment,' the Court held, 'is not inherently expressive' because it requires 'explanatory speech' to communicate its message." *Id.*

In *FAIR*, the Government did not care why it was not being granted access to on-campus student interviews. 546 U.S. at 57 ("The Solomon Amendment does not focus on the content of a school's recruiting policy" but instead "looks to the result achieved by the policy and compares the 'access ... provided' military recruiters to that provided other recruiters"). Here, the Anti-BDS law only cares about "refusing to deal with, terminating business activities with, or otherwise taking any action," when the reason is because of a message Texas disagrees with. Tex. Gov't Code § 808.001 (only applying when the refusal is "intended to penalize, inflict economic harm on, or limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israelicontrolled territory, but does not include an action made for ordinary business purposes"). And so, in order to enforce the Anti-BDS law, Texas requires a specific certification creating the very "speech" that was absent and detached from *FAIR* as a necessary part of the Court's conclusion. *Compare* Tex. Gov't Code § 2270.002 (requiring certification) *with FAIR*, 547 U.S. at 66 (refusal to provide military recruiters access was "expressive only because the law schools accompanied their conduct with speech explaining it"); *see also Jordahl*, 336 F. Supp. 3d at 1042 ("when a statute requires a company, in exchange for a government contract, to promise to refrain from engaging in certain actions that are taken in response to larger calls to action that the state opposes, the state is infringing on the very kind of expressive conduct at issue in *Claiborne*").

*FAIR* does not mention *Claiborne*, or other important First Amendment cases such as *FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411, 415-16 (1990), and *International Longshoreman's Association v. Allied International, Inc.*, 456 U.S. 212 (1982), at all. When the

Supreme Court overrules, abrogates, or distinguishes prior decisions, it does so expressly. The Supreme Court's unanimous, narrow decision in *FAIR* cannot be read to have upset decades of prior boycott caselaw covertly and without dissent.

Texas again claims (at 15) that *Claiborne* distinguished between protected messaging and an unprotected boycott. But *Claiborne* rejected that proposition. *Claiborne* instead held that the Government could not punish the boycott alone. 458 U.S. at 911 (the "boycott clearly involved constitutionally protected activity," and its speech elements, "though not identical, are inseparable"); *see also Amawi*, 373 F. Supp. 3d at 744; *see generally Jordahl*, 336 F. Supp. 3d at 1042-43.

## B.     *Longshoremen* does not apply.

Likewise, contrary to Texas's arguments (at 16) *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.,* 456 U.S. 212 (1982), does not control. Again, the explanation in *Amawi* why Texas is wrong is sound. 373 F. Supp. 3d at 745-46; *see also Jordahl*, 336 F. Supp. 3d at 1041. As explained by *Claiborne* itself, *Longshoremen* is cabined to the labor context, holding that a government may bar secondary boycotts "by labor unions . . . as part of Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." 458 U.S. at 912 (internal quotation marks and citation omitted).

## C.     O'Brien and Jaycees do not apply.

Finally, Texas's attempt (at 12-13) to find refuge in *Jaycees* and *O'Brien* should be rejected. Content-neutral antidiscrimination laws may validly infringe on First Amendment rights whenever those laws are tailored to serve a compelling state interest. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623-24 (1984) (antidiscrimination law is tailored to meet a compelling

4

state interest when it "does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria"); *but see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (neutral antidiscrimination law may not validly prohibit certain expressive conduct). But the Anti-BDS law is not viewpoint neutral, and thus is not narrowly tailored under *Jaycees*. *Invisible Empire of the KKK v. Thurmont*, 700 F. Supp. 281, 288 (D. Md. 1988) (antidiscrimination law that was not "content-neutral" not narrowly-tailored); *Bd. of Ancient Order of Hibernians v. Dinkins*, 814 F. Supp. 358, 368 (S.D.N.Y. 1993) (similar); *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) ("existence of adequate content-neutral alternatives thus 'undercuts significantly' any defense of" a statute as narrowly tailored to meet a compelling government interest) (alteration and citation omitted).

Since the Anti-BDS law fails the *Jaycees* test, it cannot be upheld against First Amendment challenge as an antidiscrimination law. *See also Amawi*, 373 F. Supp. 3d at 749. In addition, the Anti-BDS law does not serve a compelling interest because it is underinclusive, *id.*, and because it "was not enacted to prevent discrimination on the immutable characteristic of national origin, *id.* at 750. Nor was it narrowly tailored for that matter. *Id.* at 751-52.

Similarly, because the law is not content-neutral, and is directed at punishing disfavored speech, *United States v. O'Brien,* 391 U.S. 367, 376–77 (1968), is inapplicable. *See Texas v. Johnson*, 491 U.S. 397, 407 (1989) ("[W]e have limited the applicability of *O'Brien's* relatively lenient standard to those cases in which the governmental interest is unrelated to the suppression of free expression.") (citation and quotation marks omitted).

## II.     The Anti-BDS law is an unconstitutional compulsion of speech.

*Amawi* also found that the Anti-BDS law's certification requirement was unconstitutional compel speech. 373 F. Supp. 3d at 754-55. Texas, in contract, claims (at 11-12) the certification requirement, like the certification in and *Cole v. Richardson*, 405 U.S. 676, 680 (1972), is just a declaration that the signer will follow the law.

As *Amawi* explained, the certification is not a mere generic request that the signer verify that it will follow the law. 373 F. Supp. 3d at 754-55. Rather, it is an invasive attempt "to make inquiries about a person's beliefs or associations," "solely for the purpose of withholding a right or benefit because of what he believes," *id.* (quoting *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6-7 (1971)).

The certification requirement is also unconstitutional because it is directed at one specific type of activity—refusing to purchase goods from Israel and related conduct—which is not in and of itself unlawful. Instead, the law merely prohibits a "governmental entity" from entering into contracts absent the no-boycott certification, Tex. Gov't Code § 2270.002, and requires the various Texas Retirement Systems and the permanent school fund from investing in entities that Texas has found to boycott Israel, Tex. Gov't Code § 808.001, et seq.

In any event, as explained above, Texas's arguments (incorrectly) rely on *FAIR* for the constitutionality of the Anti-BDS Law generally. But, even if *FAIR* applies, the boycott may only be prohibited because of the lack of any speech component to the prohibition. 547 U.S. at 66 ("these actions were expressive only because the law schools accompanied their conduct with speech explaining it").  Requiring A&R to sign the certification compels A&R to express a particular viewpoint, rendering the Anti-BDS unconstitutional in any event.

According to Texas, the NAACP and their members in *Claiborne* could advocate for a boycott of white merchants, but they had no right to refuse to visit their stores or purchase their merchandise. 458 U.S. at 900, 911-12; *see* § I, above. And so, according to Texas, Mississippi and Claiborne County could have required the NAACP's members to certify that they would not boycott racially discriminatory businesses. Since any result blocking that NAACP activism would be wrong under Claiborne itself, Texas must be wrong as well.

## III. The law is unconstitutionally vague and overbroad.

### A. Canons of construction cannot save the Anti-BDS law's amorphous nature.

Texas also disagrees (at 18-20) with the holding in *Amawi* that the Anti-BDS law is vague and overbroad. 373 F. Supp.3d at 752, 755-58. It relies on three canons-- the noscitur a sociis canon, the ejusdem generis canon, and the canon of constitutional avoidance.

The last of those three, the canon of constitutional avoidance, does not apply in vagueness cases. *United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019), *cert. denied*, No. 18-1338, 2019 WL 4923463 (U.S. Oct. 7, 2019). If it did, the canon would defeat the vagueness rule, as the canon would require some particular interpretation of the statute, and then, assuming that interpretation, the statute would no longer be vague. "Due process requires [legislatures] to speak in definite terms, particularly where the consequences for individual liberties are steep." *Simms*, 229 F.3d at 251. "For similar reasons, although courts must interpret statutes under the presumption that legislators do not intend to violate the Constitution, judges cannot revise invalid statutes." *Id.*; *see also Brown v. Ent't Merchants Ass'n*, 564 U.S. 786, 807 (2011) ("While 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity,' [the] 'government may regulate in the area' of First

7

Amendment freedoms 'only with narrow specificity.'") (citations omitted); *see also Amawi*, 373 F. Supp. 3d at 755-56.

The other two canons provide no more help, because "otherwise taking any action that is intended to penalize, inflict economic harm, or limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory," is inherently vague. And this can be seen by Texas's own defense. Texas claims that it "refers to economic conduct similar to its predecessor terms "refusing to deal with" or "terminating business activities with." Put aside that the limitation that an action be "economic," whatever that means, is contained nowhere in the law itself. What are the limits of that interpretation? Texas provides no clue. Sure, it would include "intentionally raising prices on items shipped to Israel," and "refusing to ship products to Israel." Or at least it does if such actions are not taken for an "ordinary business purpose."

What that separate "ordinary business purpose" safe harbor provision means—a provision *Amawi* separately found unconstitutional and which Texas does not even attempt to defend—is anybody's guess. But does it apply, as *Amawi* pointed out, to "donating to a Palestinian organization, purchasing art at a Gaza liberation fair, donating to an organization like Jewish Voice for Peace that organizes BDS campaigns or picketing outside Best Buy to urge shoppers not to buy HP products because of the company's relationship with the IDF?" 373 F. Supp. 3d 756. Does it apply to decisions to do business with organizations that boycott or criticize Israel? Does it apply, as the Eighth Circuit found on almost the exact same language, to a company's decision to "support and promotion of boycotts of Israel?" *Arkansas Times*, 988 F.3d at 466. *See also Martin,* 2021 WL 2068261, at *9.

Likewise, the safe harbor carve-out for "ordinary business purposes" is hopelessly vague. As *Amawi* explained, "Texas's definition appears to simply define "ordinary business purpose" in the negative as any purpose that is not 'because a company is based in Israel'" (cleaned up). But that provides no clarity either. HP is not based in Israel (though HP Israel is). Do boycotts against HP generally qualify as ordinary business purposes, as opposed to ones of just HP Israel? Again, the statute is clear as mud. Nor is it clear whether "ordinary business purposes" would apply when AirBNB acceded to demands to refrain to do business in Israel for purely financial reasons,[4] or when Unilever fails to divest a wholly owned subsidiary with an independent board, like Ben & Jerry's Ice Cream, that has chosen to boycott Israel.[5]

Of course, in another sense, neither provision is vague. The catchall is designed to ensure that anyone who is a supporter of the BDS movement is covered—or at least cannot sign a certification to the contrary—while the ordinary business purposes safe harbor is designed to make sure that ***only*** supporters of the BDS movement—and perhaps those that listen to them, like AirBNB, or have commercial relationships with them, like Unilever—are covered. But because the law's actual dimensions make it so clear that it is speech and expression,

---

[4] See Elizabeth Findell, *In pro-Israel move, Texas books boycott of Airbnb*, AUSTIN AMERICAN STATESMAN (Mar. 11, 2019), available at https://www.statesman.com/news/20190311/in-pro-israel-move-texas-books-boycott-of-airbnb; *see also* Amanda McCaffrey, *Airbnb's Listings in Disputed Territories: A Tortured Compromise*, JUST SECURITY (July 29, 2019), available at https://www.justsecurity.org/65114/airbnbs-listings-in-disputed-territories-a-tortured-compromise/.

[5] *See* Drew Berry, Ben & Jerry's, *Unilever added to Texas list of companies boycotting Israel*, KVUE (Sept. 23, 2021), *available a*t https://www.kvue.com/article/news/local/texas/ben-jerrys-unilever-added-to-texas-list-of-companies-boycotting-israel/269-5b561a30-5a0b-49f5-99a7-0899a0f47d84.

rather than conduct, that it is punishing, Texas instead uses a vague incomprehensible stew to attempt to accomplish implicitly what it cannot do explicitly.

This also disposes of Texas's argument (at 19-20) that the Anti-BDS law is not over-broad because any overbreadth must be "substantial … judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). But here, the whole purpose of the catchall and the safe harbor provisions is to ensure that conduct is only punished when it is accompanied by speech and expressive conduct that Texas opposes. The law does not allow Texas to act as such "thought police." *New York County Bd. Of Ancient Or. Of Hibernians v. Dinkins*, 814 F. Supp. 358, 369 (S.D.N.Y. 1993) ("it is the American way for political leaders to seek to convince citizens of the correctness of some view by persuasion and not by fiat").

### B.   A&R may make a facial challenge to the Anti-BDS Law's vagueness and overbreadth.

Texas also separately suggests (at 17-19) that A&R cannot even make a vagueness and overbreadth challenge to the Anti-BDS law because A&R boycotts Israel for personal reasons and thus falls within its scope regardless of its vagueness.  But under *Broadrick*, 413 U.S. at 612, an individual affected by a statute may make a facial challenge under First Amendment overbreadth and vagueness grounds. Texas all but concedes as much, but claims (at 6) that *Broadrick* only applies "provision by provision." But the provision at issue is the clause that defines "Boycott of Israel"—the precise and singular thing the Anti-BDS law punishes—applies to A&R. Texas's argument to the contrary just assumes that "provision by provision" means "word by word," but there is no support for that. And even if it did, "otherwise taking any action that is intended to penalize, inflict economic harm, or limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-

10

controlled territory" may very well apply to A&R, an entity that boycotts Israel, participates in the BDS movement, and refuses to sign a certification that compels it espouse a political view Plaintiff does not hold. Given Texas itself defines the provision as simply meaning "similar conduct" to boycotting Israel, Texas MTD at 19, such conduct applies even under Texas's improper attempt to limit the clause. *See generally Intl. Women's Day March Plan. Comm. v. City of San Antonio*, 619 F.3d 346, 357 n.13 (5th Cir. 2010) (plaintiff may make First Amendment overbreadth challenge when the statutory provision being challenged interferes with their rights generally, distinguishing *SEIU v. City of Houston*, 595 F.3d 588 (5th Cir.2010)). The fact that A&R also directly refuses to deal with entities in Israel is irrelevant under Texas's "provision by provision" approach, since that would be a different provision anyway.

## IV.    The First Amendment applies to government contracts.

Finally, Texas argues that the Anti-BDS is just a restriction of Government speech. This is plainly false—the law penalizes A&R for A&R's protected expression. *See* § I, above. What Texas appears to be arguing, instead, is that the First Amendment does not apply to conditions on Government contracts.

The Supreme Court rejected that argument in *Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996). *Umbehr* held that the First Amendment applies in full to government contracting decisions, with the only distinction being that courts may consider the Government's particular proprietary "interests" in performing the relevant balancing test. *Id.* at 678-79; *see also Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968) (same for government employment); *see generally Jordahl,* 336 F. Supp. 3d at 1044-50; *Amawi*, 373 F. Supp. 3d at 752; *Umbehr*, 283 F. Supp. 3d at 1020-21. Which makes sense. Employment is just a very common form of government contract.

11

*Rust v. Sullivan*, 500 U.S. 173 (1991), relied upon by the Government, is not a contracting case, but simple government funding case involving Title X funds. And even if this were a simple funding case, Texas still could not do what it does here, that is, to demand an entity engage or refrain from engaging in expressive conduct that goes "outside the scope of the federally funded program." *Id.* at 197; *see also AID v. All. for Open Socy. Intern., Inc.,* 570 U.S. 205, 218 (2013) (explaining *Rust*); *Arkansas Times,* 988 F.3d at 467 (rejecting Arkansas's similar argument). *Walker v. Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245 (2015) is not about a speech restriction at all, but about what the Government may say on its own behalf. If Texas wants to express its profound sadness and regret that individuals like A&R boycott Israel, it may do so. But what it may not do is condition a government contract on the contractor agreeing with Texas's message.

## V.    A&R may obtain an injunction on behalf of others.

Texas contends (at 5-6) any injunction must be limited to A&R. This fails for four reasons.

First, although Texas appears to be hinting at the recent challenge to nationwide injunctions, whatever the merits of that, universal injunctions against state laws that are facially unconstitutional have been around for over 100 years. *See generally* Mila Sohoni, *The Lost History of the "Universal" Injunction*, 133 HARV. L. REV. 920, 958-74 (2020); *Pierce v. Socy. of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510 (1925). And, indeed, just last term, the Supreme Court granted an injunction against COVID restrictions that violated the First Amendment, not just on behalf of the parties, but on anyone covered by the law. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020). The only question is whether the injunction is not overbroad to apply to permissible applications. *Inclusive Communities Project, Inc. v.*

*Texas Dept. of Hous. and Community Affairs*, 2012 WL 3201401, at *4 n.2 (N.D. Tex. Aug. 7, 2012) (attached hereto as Exhibit 2).[6] But a facially-unconstitutional law under the First Amendment has no permissible applications.

Second, even if the issue of nationwide injunctions were relevant to this case, the Fifth Circuit has taken a position on them—they are permissible. *Texas v. U.S.*, 809 F.3d 134, 188 (5th Cir. 2015), *as revised* (Nov. 25, 2015). For now, the law in this Circuit is settled.

Third, Defendants ignore that, in the First Amendment context, plaintiffs may challenge laws beyond their particular application to the plaintiffs. *Broadrick*, 413 U.S. at 612. Furthermore, Plaintiffs met their burden on a First Amendment challenge to show either that "no set of circumstances exists under which [the Act] would be valid or that it lacks any plainly legitimate sweep," or that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted). The Act has no legitimate sweep, and, even if it did, a substantial number of its applications are unconstitutional. Therefore, *Amawi* correctly interpreted Plaintiffs' challenge as facial and issued a facial injunction to the Act. 373 F. Supp. 3d 742 n.4 (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010)).

There is one law responsible for A&R's injury: Texas's Anti-BDS Law. And that law is facially invalid. Because Plaintiff's injury is traceable to the law itself, a remedy striking down the Anti-BDS Law would grant A&R the injunctive relief it seeks.

And finally, even if all the other issues were put aside, an injunction that strikes down the law entirely is necessary to provide complete relief to A&R. The Anti-BDS Law, by

---

[6] *Amended in part*, 2012 WL 5458208 (Nov. 8, 2012), *rev'd and remanded on other grounds*, 747 F.3d 275 (5th Cir. 2014*), aff'd and remanded on other grounds*, 576 U.S. 519 (2015).

compelling speech in favor of Israel and punishing speech critical of it, skews the terms of the political debate around Israel and Palestine. And this skewing of the political debate affects A&R. After all, A&R participates in a boycott.

A boycott is, by definition, concerted activity. So long as Texas continues to stifle the boycott, that limits the effectiveness of A&R's boycott. *See Jordahl v. Brnovich*, 336 F. Supp. 3d at 1033 (noting the Anti-BDS Act "undermines the expressive nature of collective political boycotts by chilling Appellees' ability to join in larger calls for political change."); *see* also *Koontz v. Watson*, 283 F. Supp. 3d at 1022 (participants in BDS "seek to amplify their voices to influence change"). So long as others besides A&R are prohibited from boycotting Israel, this restrains A&R and similarly situated companies and people from acting in concert to do the same.

## <u>CONCLUSION</u>

Boycotting Israel may be unpopular. But the First Amendment protects all opinions, regardless of how popular they are. Because the Anti-BDS Law is unconstitutional, because A&R has standing to challenge it, and because A&R has a right to obtain an injunction which prohibits Texas from enforcing its unconstitutional law, this Court should deny Texas's Motion to Dismiss.

Dated:  December 13, 2021                     Respectfully submitted,

**JOHN T. FLOYD LAW FIRM**

John T. Floyd (TX Bar No. 00790700)
    jfloyd@johntfloyd.com
**Christopher M. Choate (TX Bar No. 24045655)**
    choate@johntfloyd.com
**4900 Woodway Dr., Ste. 725**
**Houston, TX 77056**
**Phone: (713) 224-0101**
**Fax:    (713) 237-1511**

**CAIR LEGAL DEFENSE FUND**

Lena F. Masri (D.C. Bar No. 1000019) α
    lmasri@cair.com
Gadeir I. Abbas (VA Bar No. 81161) #*
    gabbas@cair.com
Justin Sadowsky (D.C. Bar No. 977642)
    jsadowsky@cair.com
453 New Jersey Ave., SE
Washington, DC 20003
Phone: (202) 742-6420
Fax:    (202) 488-0833

α *SDTX admission application forthcoming*
# *Admitted Pro Hac Vice*
* *Licensed in VA, not in D.C.*
  *Practice limited to federal matters*

# Exhibit 1

KeyCite Yellow Flag - Negative Treatment

Amended in Part by Inclusive Communities Project, Inc. v. Texas Dept. of Housing and Community Affairs, N.D.Tex., November 8, 2012

2012 WL 3201401

Only the Westlaw citation is currently available.

United States District Court,

N.D. Texas,

Dallas Division.

The INCLUSIVE COMMUNITIES PROJECT, INC., Plaintiff,

v.

The TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS, et al., Defendants.

Civil Action No. 3:08–CV–0546–D.

|

Aug. 7, 2012.

**Attorneys and Law Firms**

Michael M Daniel, Law Office of Michael M Daniel, Laura Beth Beshara, Daniel & Beshara, Dallas, TX, for Plaintiff.

G. Tomas Rhodus, David Cameron Gair, James D Macintyre, William B Chaney, Michael C Kelsheimer, Looper Reed & McGraw, Dallas, TX, Shelley Dahlberg, Timothy Earl Bray, Office of the Texas Attorney General, Austin, TX, for Defendants.

*MEMORANDUM OPINION AND ORDER*

SIDNEY A. FITZWATER, Chief Judge.

**\*1** Having found in favor of plaintiff The Inclusive Communities Project, Inc. ("ICP") on its disparate impact claim under §§ 3604(a) and 3605(a) of the Fair Housing Act ("FHA"), the court now addresses the appropriate remedy for awarding Low Income Housing Tax Credits ("LIHTC") in the Dallas metropolitan area.

I

As directed, defendants Texas Department of Housing and Community Affairs and its Executive Director and board members in their official capacities (collectively, ("TDHCA"), have submitted a proposed remedial plan ("Plan"). According to TDHCA, operating under the constraints of federal and state law, the Plan does the following:

focuses on: (1) according proposed developments located in defined high opportunity areas the greatest incentives allowed by state law; and, (2) according developments in Qualified Census Tracts (QCTs) that are part of true concerted revitalization plans co-equal incentives in order to provide the preference created by Internal Revenue Code § 42(m). It is envisioned that the revitalization incentive will set a very high threshold, making it unlikely to yield a number of successful applicants in QCTs such that would perpetuate any discriminatory patterns found to have occurred unintentionally.

Ds. Plan 4. The Plan contains the following twelve-points:

1. TDHCA states that Governor Perry, in approving the 2012 Qualified Allocation Plan ("QAP"), determined that forward commitments were not desirable and that waivers should only be granted when "necessary to further a purpose or policy enunciated in Tex. Gov't Code, Chapter 2306." *Id.*

2. TDHCA proposes to further strengthen the definition of a high opportunity area ("HOA") by adopting the following "Opportunity Index":

| Points | Population Served | Poverty Factor | Income Factor | School Quality Factor |
|---|---|---|---|---|
| 7 | General | <15% for all individuals | Top quartile of median household income for county or top quartile for Metropolitan Statistical Area ("MSA") | Exemplary or recognized |
| 5 | General | <15% for all individuals | Top 2 quartiles of median household income for county or top 2 quartiles for MSA | Exemplary or recognized |
| 5 | Any | <15% for all individuals | Top quartile of median household income for county or top quartile for MSA | Exemplary or recognized |
| 3 | Any | <15% for all individuals | Top quartile of median household income for county or top quartile for MSA | n/a |
| 1 | Any | <15% for all individuals | Top 2 quartiles of median household income for county or top 2 quartiles for MSA | n/a |

*Id.* at 6–7.

TDHCA also suggests adding certain below-the-line criteria, which it maintains are "indicative of educational quality and opportunity or lack of affordable housing." *Id.* at 7. Moreover, it offers to remove all other "Development Location" options in the below-the-line criterion unless the option is required by statute so that it will maintain high incentives to target HOAs.

**\*2** 3. TDHCA proposes to continue including a 130% basis boost for applications proposing development sites located in HOAs.

4. In order to effectuate the preference in 🔖 I.R.C. § 42(m) for developments located in QCTs and which contribute to a concerted community revitahzation plan, TDHCA proposes the following "Revitahzation Index":

| Points | Population Served | Criteria |
|---|---|---|
| 7 | Any | The proposed development site is located in a QCT in which there is in effect a concerted revitahzation plan consistent with the elements described in § 5 and the non-housing costs, as |

|   |     |                                                                                                                                                                                                                                                    |
|---|-----|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|   |     | reflected in the local government certified plan budget, exceed $25,000 per unit in the proposed development.                                                                                                                                        |
| 3 | Any | The proposed development site is located in a QCT in which there is in effect a concerted revitahzation plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $10,000 per unit but are less than $25,000 per unit |
| 2 | Any | The proposed development site is not located in a QCT but there is in effect a concerted revitahzation plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $10,000 per unit. |

*Id.* at 10–11.

5. TDHCA offers to continue including criteria for disqualifying proposed sites that have undesirable features. It also proposes to require an applicant to obtain pre-clearance if the proposed development is located at or within 1000 feet of certain negative site features.

6. In line with the "Revitalization Index," TDHCA proposes to strengthen the requirements to establish a concerted revitalization plan in order to insure that "true community revitalization is occurring." *Id.* at 15.

7. TDHCA proposes to promulgate by rule a fair housing choice disclosure to advise prospective tenants of alternative housing and fair housing rights. TDHCA also proposes to maintain a website with relevant information.

8. TDHCA proposes to conduct an annual analysis, which will be made public, of the "effects of its prior QAP to determine if that QAP ... contribut[es] to a disparate impact[,]" in order to "take appropriate and lawfully permitted measures to amend the next and subsequent QAPs ... to avoid [the] present and potentially developing disparate impact." *Id.* at 18.

9. TDHCA proposes adding a mechanism to challenge the grounds for public comments that could lead to the negative scoring of 9% applications or constitute opposition to proposed 4% developments. Additionally, applications in HOAs receiving statements of support or neutrality from a neighborhood organization that previously opposed a development, causing it to lose points, will receive two additional points. TDHCA must also amend its debarment rules so that if any applicant attempts to create opposition to an application, they will be subject to debarment.

**\*3** 10. TDHCA proposes that "[i]n the event of a tie in scoring, the tie breaker will be a preference for the developments that are located the greatest distance from the nearest development that is assisted by either 4% or 9% [LIHTCs]." *Id.* at 20.

11. TDHCA proposes to "continue to make available on its website proposed and final QAPs with comments and responses, applications, underwriting reports, application and award logs, scoring logs by subject, inventories, and appeal materials." *Id.* at 20. It also proposes to "post market studies, Phase I Environmental Site Assessments and property condition assessments on its website." *Id.*

12. TDHCA acknowledges that it is subject to statutory constraints, including "adherence to the Texas Administrative Procedures Act; the Texas General Appropriations Act; Chapter 2306 of the Texas Government Code; and adherence to various federal requirements regarding the administration of other sources of funding impacting [TDHCA's] ability to address such matters." *Id.* at 20.

ICP and intervenor Frazier Revitalization Inc. ("FRI") object to components of the Plan.[1]

II

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swarm v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). This power, however, is not plenary and may be exercised only on the basis of the violation. *See, e.g., Dayton v. Bd. Of Educ. v. Brinkman,* 433 U.S. 406, 419–20, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Swann,* 402 U.S. at 16. The scope of the remedy must be tailored to fit "the nature of the violation" and cannot be "broader than that necessary to remove the violation and its effects." *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 145 (3d Cir.1977) (quoting *Brinkman,* 433 U.S. at 419). "A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." *Freeman v. Pitts,* 503 U.S. 467, 489, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). Moreover, "the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Spallone v. United States,* 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (quoting *Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)).

It is within the court's authority to "order[ ] such affirmative action as may be appropriate" in order to remedy a FHA violation. 42 U.S.C. § 3613(c)(1). "Appropriate relief for violations of the [FHA] is to be determined on a case-by-case basis with relief tailored in each instance to the needs of the particular situation." *United States v. Jamestown Center–in–the–Grove Apartments,* 557 F.2d 1079, 1080 (5th Cir.1977) (citations omitted). "Relief should be aimed toward twin goals insuring that no future violations of the [FHA] occur and removing any lingering effects of past discrimination." *See id.* (collecting cases).

III

A

**\*4** As proposed by TDHCA, the court adopts by judgment filed today the following remedy for TDHCA's violation of the FHA. Pending further order of this court, TDHCA must apply the following remedy as to the Dallas metropolitan area in accordance with TDHCA's proposal:[2]

1. include in the QAP the additional below-the-line criteria provided by the "Opportunity Index";

    2. include in the QAP the additional below-the-line criteria regarding the quality of public education and anti-concentration, and remove all other "Development Location" criteria set forth;

3. continue to provide a 130% basis boost for developments in HOAs;

4. continue to include in the QAP criteria for disqualifying proposed development sites that have undesirable features and incorporate the more robust process to identify and address other potentially undesirable site features;

5. promulgate by rule a fair housing choice disclosure for prospective tenants and maintain a website providing information as to tax-credit assisted properties;

6. conduct an annual disparate impact analysis;

7. provide a mechanism to challenge public comments that cause proposed developments to receive negative points and include in the QAP the additional two-point below-the-line criterion regarding support or neutrality from a neighborhood organization that previously opposed a development and an associated debarment rule; and

8. in the event of a tie in scoring a 9% application, adopt a tie breaker in favor of an application proposing development in an HOA.

B

TDHCA must also submit an annual report to the court so that the court can evaluate whether, during the reporting period, TDHCA has "insur[ed] that no future violations of the [FHA] occur[red] and remov[ed] any lingering effects of past discrimination." *See id.*

No later than 90 days after the date the judgment is filed, the parties must confer regarding what information the report should contain. No later than 120 days after the date the judgment is filed, the parties must make a joint submission to the court stating (1) whether they agree to the contents of the report, and, if they do not agree in all respects to the contents, (2) their specific agreements and disagreements and their reasons for disagreement. The court will then issue an order prescribing the contents of the annual report.

Each calendar year, no later than 120 days after the TDHCA Board of Directors ("Board") issues final commitments for allocations of LIHTC, TDHCA must file the annual report with the clerk of court.[3] Within 30 days of the date TDHCA files the annual report, any other party may comment on the report by filing the comments with the clerk of court and serving all other parties. TDHCA may file a reply to a comment no later than 30 days after the comment is filed. TDHCA may include in an annual report, and another party may include in a comment, a request to modify a provision of the remedial plan. The request must set forth why the provision is no longer necessary or is insufficient to "insur[e] that no future violations of the [FHA] occur and remov[e] any lingering effects of past discrimination." *Id.; see also Brown v. Plata,* —— U.S. ——, 131 S.Ct. 1910, 1946, 179 L.Ed.2d 969 (2011) (quoting *N.Y. State Ass'n for Retarded Children v. Carey,* 706 F.2d 956, 967 (2d Cir.1983)) ("The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible.").

**\*5** For the reasons explained *infra* at § VII, the annual reporting procedure shall remain in effect during the period during which the court retains jurisdiction over this case.

IV

The court turns first to the proper interpretation of § 42(m)(1) (B)(ii)(III) of the Internal Revenue Code ("I.R.C."), 26 U.S.C. § 42(m)(1)(B)(ii)(III). FRI objects to the Plan, contending that it violates § 42(m)(1)(B)(ii) by failing to give preference to developments that contribute to a concerted community revitalization plan. FRI Objs. 3. And in the Plan, TDHCA may be interpreting § 42(m)(1)(B)(ii) to impose a project selection preference. *See* Ds. Plan 15 (stating that "Consistent with § 42(m) of the Internal Revenue Code, the 2012 QAP offers incentives for applications in qualified census tracts and for applications in areas where the housing is a necessary component of a community revitalization plan.").

## A

FRI contends that the Plan violates § 42(m)(1)(B)(ii) because it does not give preference to developments that are located in QCTs and that contribute to a concerted community revitalization plan. FRI maintains that the Plan fails in several respects to give preference to such projects. First, FRI argues that the most recent QAP already gives preference to developments to be located in an HOA rather than to developments focused on revitalization, and that the Plan only strengthens that preference. FRI contends that this preference is in part demonstrated by the fact that, following the most recent QAP, TDHCA provided data showing the "virtual curtailment of QCT [applications]." FRI Objs. 6 (quoting Ds. Plan 9).[4] Second, FRI argues that TDHCA does not give preference to revitalization developments because, in order to curtail revitalization development, it has intentionally established "high thresholds" that must be met for revitalization developments to qualify for available additional points. Third, FRI argues that TDHCA's proposed remedy alters the scoring system by making additional points available to HOA developments without making similar points available to revitalization developments, and this demonstrates that revitalization developments are not given preference by the QAP. In summary, FRI's objections are based on concerns that the Plan will significantly decrease the number of revitalization projects that are awarded LIHTC, and FRI contends that such a plan fails to give preference to revitalization projects, in violation of § 42(m)(1)(B)(ii).

## B

In *Inclusive Communities Project, Inc. v. Texas Department of Housing and Community Affairs,* 749 F.Supp.2d 486 (N.D.Tex.2010) (Fitzwater, C.J.), the court held that TDHCA had failed to demonstrate that it could not comply with both the FHA and § 42. *Id.* at 506 n. 21. FRI argues that, despite this conclusion, § 42 governs the allocation of LIHTC and the Plan cannot require that TDHCA violate § 42, which FRI maintains the Plan does. The court agrees with FRI that the remedy in this case must comply with both the FHA and § 42. But the court holds that the Plan *can* comply with the FHA without violating § 42(m)(1)(B)(ii)(III). This conclusion follows from a correct interpretation of I.R.C. § 42.

**\*6** The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). The court's "inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Id.* (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). "Unless exceptional circumstances dictate otherwise, '[w]hen [the court] find [s] the terms of a statute unambiguous, judicial inquiry is complete.' " *Burlington N. R.R. Co. v. Okla. Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in

which that language is used, and the broader context of the statute as a whole." *Robinson,* 519 U.S. at 341 (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991)).

2

LIHTC are a type of general business credit. *See* I.R.C. § 38(b)(5). Section 42 sets forth the eligibility requirements for those seeking LIHTC, the method for calculating the amount of the credit, and the requirements of state housing agencies, such as TDHCA, in allocating their state's LIHTC. One such requirement is that state housing agencies must allocate all LIHTC dollar amounts pursuant to a QAP. *See* I.R.C. § 42(m)(1)(A)(i). Under I.R.C. § 42(m)(1)(B), a QAP

means any plan-

(i) which sets forth selection criteria to be used to determine housing priorities of the housing credit agency which are appropriate to local conditions,

(ii) which also gives preference in allocating housing credit dollar amounts among selected projects to-

(I) projects serving the lowest income tenants,

(II) projects obligated to serve qualified tenants for the longest periods, and

(III) projects which are located in qualified census tracts (as defined in subsection (d)(5)(C)) and the development of which contributes to a concerted community revitalization plan, and

(iii) which provides a procedure that the agency (or an agent or other private contractor of such agency) will follow in monitoring for noncompliance with the provisions of this section and in notifying the Internal Revenue Service of such noncompliance which such agency becomes aware of and in monitoring for noncompliance with habitability standards through regular site visits.

I.R.C. § 42(m)(1)(B).

Both Frazier and TDHCA interpret § 42(m)(1)(B)(ii)(III) as requiring TDHCA to give preference to projects located in QCTs that contribute to a concerted community revitalization plan by providing such projects with additional points in the QAP's competitive scoring system. But § 42(m)(1)(B)(ii)(III) requires that the QAP "give[ ] preference in allocating housing credit dollar amounts *among selected projects* to... projects which are located in qualified census tracts (as defined in subsection (d)(5)(C)) and the development of which contributes to a concerted community revitalization plan[.]" *Id.* at § 42(m)(1)(B)(ii)(III) (emphasis added). The dictionary definition of "selected" is "[s]ingled out in preference: chosen." Webster's II New Riverside University Dictionary 1057 (1984).[5] Because "selected" is in the past tense, the statute mandates that the preference given to QCTs in allocating LIHTC dollar amounts occur *after* the projects have been selected. In other words, § 42(m)(1)(B)(ii)(III) does not require that the QAP award additional points so that projects located in QCTs and the development of which contribute to a concerted community revitalization plan are preferred over other projects.[6] Instead, § 42(m)(1)(B)(ii)(III) provides that, *after* projects have been selected, projects located in QCTs, and the development of which contributes to a concerted community revitalization plan, must be given preference in allocating LIHTC dollar amounts among the projects that have already been selected.

**\*7** This interpretation of § 42(m)(1)(B)(ii)(III) is supported by § 42(m)(1)(C), which specifies selection criteria that a QAP must include. One selection criterion is the "project characteristics, including whether the project includes the use

of existing housing as part of a community revitalization plan." *Id.* at § 42(m) (1)(C)(iii).[7] The inclusion of this criterion as one of several criteria confirms that Congress only intended revitalization projects that include the use of existing housing as part of a community revitalization plan to be one factor in the selection process, not a dispositive or preferred one. Congress could have, but did not, require that a QAP effectively prefer revitalization projects in QCTs by including that requirement in 📑 § 42(m)(1)(C). Accordingly, under a correct interpretation of the statute, the preference mandated by 📑 § 42(m)(1)(B)(ii)(III) comes into play *after* projects are selected and when LIHTC dollar amounts are being allocated *among selected projects.*[8]

The court recognizes that, due to the LIHTC selection system adopted in the state of Texas and implemented in the Texas QAP, only in rare circumstances will proposed developments in QCTs benefit from the preference set forth in 📑 § 42(m)(1)(B)(ii). This is because TDHCA only selects projects for which it has sufficient LIHTC to allocate.[9] When a developer applies for LIHTC, TDHCA staff ("Staff") first ensures that the application satisfies the threshold criteria set forth in the QAP. *See* 📑 Tex. Gov't Code Ann. § 2306.6710(a) (West 2008). The Staff then scores and ranks the applications that meet the threshold criteria according to the detailed scoring system that the QAP prescribes. *See id.* § 2306 .6710(b). Beginning with the highest scoring applications, the Staff underwrites enough projects to ensure that all LIHTC will be allocated, including by underwriting projects that the Board places on the waiting list. *See* 📑 *id.* § 2306.6710(d). After the Staff makes its recommendations, the Board selects the projects that will receive a LIHTC commitment notice. If all of the available LIHTC are committed, the Board creates a waiting list that identifies which applicants will receive any additional LIHTC that become available. If an applicant who receives a commitment notice complies with the remaining obligations in the QAP, it will receive its LIHTC allocation. Therefore, under the QAP, *every* project that the Board selects is typically allocated LIHTC, meaning there is no opportunity for TDHCA to grant projects located in QCTs a "preference in allocating housing credit dollar amounts *among selected projects,*" since every project selected by the Board is allocated the full amount of available LIHTC.

The court's interpretation of 📑 § 42(m)(1)(B)(ii)(III) does not necessarily nullify in Texas the preference that the I.R.C. mandates. Although Texas' method for distributing LIHTC rarely,[10] if ever, would require that the preference mandated by 📑 § 42(m)(1)(B) (ii)(III) affect the distribution of LIHTC among the selected projects, 📑 § 42 governs every state's housing agency. A state could adopt a system in which it selected more proposed developments to receive LIHTC than it had available credits. If that were the case, the state agency *would be required* to give preference to projects covered by 📑 § 42(m)(1)(B)(ii)(III). Such projects would be funded preferentially. Texas, however, has adopted a system in which projects are not selected if they are unlikely to receive LIHTC.[11]

**\*8** Because the TDHCA Plan only changes how projects are selected and does not alter how LIHTC dollar amounts are allocated "among selected projects," TDHCA's proposed remedy does not violate 📑 § 42(m)(1)(B)(ii)(III). Accordingly, the court holds that FRI's objections lack force.[12]

V

The court now turns to the TDHCA Plan and the parties' objections.

A

TDHCA begins its proposal with a statement regarding its discretion, as it pertains to forward commitments and waivers:

> In approving the 2012 QAP, Governor Perry determined that the continuation of the ability to make awards of forward commitments was not desirable and that in exercising its discretion to waive any aspect of the QAP the Board should only grant waivers when doing so was necessary to further a purpose or policy enunciated in Tex. Gov't.Code, Chapter 2306.

Ds. Plan 5. In other words, TDHCA does not propose a remedy; instead, it describes the nature of the QAP as it now stands. ICP contends that "TDHCA can and should use its discretion to remedy the violation." P. Obj. 13. In particular, it proposes that TDHCA use "its discretion in making allocation decisions that accomplish the remedial purpose of the plan." *Id.*

It is within the court's authority to "order[ ] such affirmative action as may be appropriate" in order to remedy a FHA violation. 42 U.S.C. § 3613(c)(1). The court declines at this time, however, to require that the QAP be amended to authorize TDHCA to award forward commitments and waivers. Such a mandate would interfere with Texas' regulation of its own affairs. *See, e. g., Spallone,* 493 U.S. at 276 ("[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.") (alteration in original) (quoting *Milliken,* 433 U.S. at 280–81). And although the court is authorized to impose such a requirement-even one that interferes with Texas' regulation of its own affairs—if necessary to remedy the FHA violation, it is presently unclear whether such a remedy would have this effect. *See Rizzo,* 564 F.2d at 145 (prohibiting remedies that are "broader than that necessary to remove the violation and its effects"). As stated above, the court retains the authority to approve amendments to the remedial plan after receiving TDHCA's report and the parties' proposals. The court can determine later whether it is necessary to empower TDHCA to award forward commitments and waivers to remedy the disparate impact.

## B

TDHCA proposes to further strengthen the definition of an HOA. It posits that, in the 2012 QAP, HOA was defined to require "a development [to] be in a census tract that has BOTH a low incidence of poverty AND an above median income as well as ... located in an area served by either recognized elementary schools or having a significant and accessible element of public transportation." Ds. Plan 5–6. It now proposes "to strengthen the criteria for locating developments within HOAs" by adopting the following "Opportunity Index":

| Points | Population Served | Poverty Factor | Income Factor | School Quality Factor |
|---|---|---|---|---|
| 7 | General | <15% for all individuals | Top quartile of median household income for county or top quartile for MSA | Exemplary or recognized |
| 5 | General | <15% for all individuals | Top 2 quartiles of median household income for county or top 2 quartiles for MSA | Exemplary or recognized |
| 5 | Any | <15% for all individuals | Top quartile of median household income for county or top quartile for MSA | Exemplary or recognized |

| 3 | Any | <15% for all individuals | Top quartile of median house-hold income for county or top quartile for MSA | n/a |
| 1 | Any | <15% for all individuals | Top 2 quartiles of median house-hold income for county or top 2 quartiles for MSA | n/a |

**\*9** *Id.* at 6. In the first line, a proposed project located in such a census tract will receive the highest number of points a below-the-line criterion may receive—here, 7 points. An application located in an area that does not meet the stringent requirements of the first line may still receive points, to a lesser degree, if it satisfies the requirements of another line. ICP does not object to the definition of HOAs or to the "Opportunity Index" to the extent that it provides "the highest value possible for below the line points for family units located in [HOAs]." P. Obj. 3. It posits that, to the extent the "Opportunity Index" offers 1 to 3 points, it is insubstantial and is "unlikely to have any remedial effect" because "[t]hese are minor points and have not worked to boost 9% program point totals in the past." *Id.* at 16. In support, ICP cites the Talton Report for the proposition that "the use of preference points for higher income areas has a 'tendency to create more local opposition' and have only a 'limited effect on a development's completed score.' " *Id.* at 17. It also "object[s] to the inclusion of applications for elderly units" in the "Opportunity Index" because "additional points for the elderly restricted units ... will not have any remedial effects and should not be part of the remedial plan."[13] P. Obj. 16; P.App. 3.

The court adopts the TDHCA Plan's proposed "Opportunity Index," and overrules ICP's objections. As stated *supra* at § V(A), the court is authorized to adopt amendments to the remedial plan after receiving TDHCA's report and the parties' proposals. The court can determine later whether it is necessary to increase certain points offered in the "Opportunity Index"[14] or to limit the index only to elderly units in order to reduce the disparate impact.

C

TDHCA proposes the addition of the following below-the-line criteria, which it asserts are "indicative of educational quality and opportunity or lack of affordable housing":

    a. Location within the attendance zone of a public school with an academic rating of "Recognized" or "Exemplary" (or comparable rating) by the Texas Education Agency (up to 3 points):

        A. 1 points if it is both an elementary school, and either a middle school or high school; or

        B. 3 points if it is an elementary school, a middle school, and a high school.

    b. A municipality or, if outside of the boundaries of any municipality, a county that has never received a competitive tax credit allocation. The application must also comply with all other anti-concentration provisions (2 points for general use/family or supportive housing; 1 point for elderly).

Ds. Plan 7–8. TDHCA also offers to remove all other "Development Location" options in the below-the-line criterion, unless required by statute, in order to preserve high incentives to target HOAs. ICP does not object to these proposals. Accordingly, the court adopts them as part of the remedy.

D

**\*10** TDHCA next states that, because the 2012 QAP offers a 130% basis boost for proposed development sites located in HOAs, it will continue to do so. ICP supports this proposal but asserts that the basis boost should be limited to non-elderly units because "[t]he provision of the 130% basis boost for elderly and supportive housing will not remedy the violation of disproportionately allocating non-elderly units to locations in predominantly minority areas." P. Obj. 14.

For the reasons stated *supra* at § V(B), the court overrules ICP's objection.

E

TDHCA next proposes the adoption of the following "Revitahzation Index":

| Points | Population Served | Criteria |
| --- | --- | --- |
| 7 | Any | The proposed development site is located in a QCT in which there is in effect a concerted revitahzation plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $25,000 per unit in the proposed development. |
| 3 | Any | The proposed development site is located in a QCT in which there is in effect a concerted revitahzation plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $10,000 per unit but are less than $25,000 per unit |
| 2 | Any | The proposed development site is not located in a QCT but there is in effect a concerted revitahzation plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $10,000 per unit. |

Ds. Plan 10–11. According to TDHCA, the failure to grant the same preference provided to HOAs by the "Opportunity Index" to revitahzation projects in QCTs is inconsistent with the preference for revitahzation projects set forth in I.R.C. § 42(m).

ICP objects to the inclusion of the "Revitahzation Index" for several reasons. First, it argues that, even according to TDHCA, the purpose of the "Revitahzation Index" is not to remedy the FHA violation but to comply with § 42(m). ICP therefore maintains that the inclusion of the "Revitahzation Index" in the remedy is improper because it makes the remedy broader than necessary to address the violation. The court has already held that § 42(m)(1) (B)(ii)(III) does not require TDHCA to give preference to revitahzation projects in QCTs when selecting which projects will receive LIHTC; thus TDHCA need not include the "Revitahzation Index" in the scoring system to comply with § 42(m). If the "Revitahzation Index" need not be included to comply with the I.R.C., there is no reason for the court to make it part of the FHA remedy. TDHCA, in fact, does not argue that the "Revitahzation Index" is a necessary component of a plan to ameliorate the FHA violation, and ICP contends that the "Revitahzation Index" may actually undercut the remedy that the court imposes. Because the "Revitahzation Index" is not required by the I.R.C. and there has been no

showing that it is a necessary component of a plan to remedy the FHA violation, its inclusion is impermissible because it will make the court's remedy broader than necessary. *See* 🔖 *Rizzo*, 564 F.2d at 145 (holding that scope of remedy must be tailored to fit "the nature of the violation" and cannot be "broader than that necessary to remove the violation and its effects").[15] Accordingly, the court declines to include the "Revitahzation Index" in the remedy.[16]


## F

**\*11** TDHCA proposes to strengthen the criteria for disqualifying proposed development sites that have undesirable features. It states that the 2012 QAP "included criteria for disqualifying proposed sites that have undesirable features," such as "developments located adjacent to or within 300 feet of junkyards." Ds. Plan 11–12. And it represents that it "will continue to include the same or similar criteria in its QAPs." *Id* . at 13. ICP does not object to this component of the Plan, stating that "[r]estricting the availability of such sites may have a remedial effect." P. Obj. 23. The court adopts this proposal as part of the remedy.

TDHCA also proposes to "incorporate a more robust process to identify and address other potentially undesirable site features" by requiring "an applicant proposing development of multifamily housing with tax credits [to] disclose to [TDHCA] and ... obtain [TDHCA's] written notification of pre-clearance if the site involves any negative site features," such as "significant or recurring flooding," " at ... or within 1000 feet of the proposed site." Ds. Plan 13. TDHCA will then determine whether to issue or withhold preclearance by reviewing the matters disclosed and conducting a site inspection, if necessary. ICP argues that "the use of a 1,000 feet distance as the primary measure for the ineligibility of a site under the criteria" is an inadequate measure of risk. P.App. 3. ICP maintains, instead, that "[t]he analysis should be on whether the condition poses such risk." P. Obj. 23–24. For the reasons stated *supra* at § V(B), the court overrules ICP's objection.


## G

TDHCA next proposes strengthening the requirements for establishing a concerted revitalization plan in order to ensure that "true community revitalization is occurring." Ds. Plan 15. Under the proposal, TDHCA can determine at a public meeting that a plan substantively and meaningfully demonstrates a revitalization effort, even if one or more factors have not been met.

TDHCA includes this in the remedial plan in an attempt to be consistent with its view of the requirements of 🔖 I.R.C. § 42(m). ICP objects to including these enhancements as part of the remedial plan. For the reasons stated *supra* at § IV, TDHCA has no legal obligation under 🔖 § 42(m) to give a preference to revitalization developments when selecting which projects will receive LIHTC. Because TDHCA does not contend that this proposal is necessary to remedy the FHA violation, the court concludes that the proposed revitalization enhancement is "broader than that necessary to remove the violation and its effects." 🔖 *Rizzo*, 564 F.2d at 145. Accordingly, the court declines to include in the remedy the point enhancements for developments that are part of a concerted community revitalization effort in the remedy.[17]


## H

TDHCA proposes to "promulgate by rule a fair housing disclosure ..., advising prospective tenants in writing of a website or other method of contact where they can obtain information about alternative housing and their rights under fair

housing laws." Ds. Plan 18. Under the Plan, this disclosure must be provided to prospective tenants before they can enter into a lease. TDHCA also proposes to "maintain a website providing relevant information and identifying tax credit assisted properties." *Id.*

**\*12** ICP posits that the disclosure and website "will not affect TDHCA's allocation decisions and will not contribute to bringing those decisions into compliance with the [FHA]." P. Obj. 24. But it acknowledges that "some form of ... notice that would be tailored for use in the Dallas remedial area would be appropriate once there are more tax credit units in Caucasian areas." *Id.* ICP suggests that the parties together determine the content of the notice.

The court disagrees with ICP's position that the disclosure and website will not reduce the disparate impact. Such initiatives could increase demand by tenants for developments located in HOAs, which could, in turn, encourage developers to propose such developments, and which then could result in increased approval rates for non-elderly developments located in predominantly Caucasian neighborhoods. The court adopts TDHCA's proposal. The content of the disclosure will be subject to periodic review as are the other provisions of the Plan.


I


TDHCA proposes to "annually conduct an analysis of the effects of its prior QAP to determine if that QAP ... contribut[es] to disparate impact." Ds. Plan 18. ICP does not object to an annual disparate impact analysis, and the court adopts the proposal as an efficacious method of monitoring whether the court-ordered remedy is ensuring that no future violations of the FHA occur and removing any lingering effects of past discrimination. *See Jamestown,* 557 F.2d at 1080 (collecting cases).[18]


J


TDHCA proposes adding a mechanism to challenge the grounds for public comments that could lead to the negative scoring of 9% applications or constitute opposition to proposed 4% developments. Under the proposal, a party challenging a comment must state the basis for the challenge. The commenting party must then provide support for the accuracy of its comment. A fact finder from TDHCA will make a final determination on the validity of the challenge. ICP does not object to this proposal. Because this proposal could offer an applicant proposing a development located in an HOA a manner to challenge negative comments, the court adopts the proposal.

TDHCA also proposes that applications in HOAs receiving statements of support or neutrality from a neighborhood organization that previously opposed a development (thus causing it to lose points) receive two additional points. ICP objects to including these points in the remedy but does not justify its opposition. Because this proposal could assist an applicant proposing a development in an HOA, the court adopts it as part of the remedy.

Finally, TDHCA proposes to amend its debarment rules so that if an applicant attempts to create opposition to an application, it will be subject to debarment. ICP objects to including new debarment rules in the remedy, arguing that debarment and the actions that could lead to it are not related, and therefore not tailored, to the FHA violation. The court disagrees, concluding that the proposed debarment rule could decrease impediments to applications for developments in HOAs.

## K

**\*13** TDHCA proposes that "[i]n the event of a tie in scoring, the tie breaker will be a preference for the developments that are located the greatest distance from the nearest development that is assisted by either 4% or 9% credits." Ds. Plan 20. ICP objects to this proposal. Similar to its argument above, ICP asserts that "[t]he use of distance alone is a TDHCA concentration policy," which does not address the disparate impact violation. P. Obj. 31. Instead, it posits that the tie breaker should be in favor of "[a]n application for a family unit development in [an HOA] which would be consistent with ... the [FHA]." *Id.* at 31–32. The court adopts ICP's proposal, concluding that it appears better tailored to reducing the disparate impact.

## L

TDHCA proposes to "continue to make available on its website proposed and final QAPs with comments and responses, applications, underwriting reports, application and award logs, scoring logs by subject, inventories, and appeal materials." Ds. Plan 20. It also proposes to "post market studies, Phase I Environmental Site Assessments and property condition assessments on its website." *Id.* ICP does not object to this proposal, and it posits that the website could also offer "other documents necessary to monitor compliance with the Court ordered plan." P. Obj. 25.

The parties do not address, and the court cannot determine, how this proposal is intended to ensure that no future violations of the FHA occur or to remove any lingering effects of past discrimination. *See Jamestown,* 557 F.2d at 1080 (collecting cases). Accordingly, the court declines to include this proposal, concluding that it is outside the scope of the court's remedial power. *See Rizzo,* 564 F.2d at 145.[19]

## M

Finally, TDHCA states that it is subject to statutory constraints, including "adherence to the Texas Administrative Procedures Act; the Texas General Appropriations Act; Chapter 2306 of the Texas Government Code; and adherence to various federal requirements regarding the administration of other sources of funding impacting [TDHCA's] ability to address such matters." Ds. Plan 20. ICP interprets this to be a proposal "that [the] court order[ ] compliance with state and federal law," asserts that this proposal has no "connection to the [FHA] violation or the appropriate remedy," and posits that "there is no basis for a Court order to require compliance with state and federal laws governing the general administration of the program." P. Obj. 32.

TDHCA does not appear to be offering a proposal. Instead, TDHCA's statement appears to reflect its position that it is subject to statutory restrictions derived from state and federal law. But 42 U.S.C. § 3615 states that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." *Id.* And TDHCA does not specify the federal laws on which it relies. The court therefore declines to include this proposal in the remedial plan.

## VI

**\*14** The court now turns to ICP's proposals. ICP asserts that "TDHCA has proposed no changes in the 4% program allocation and decision process." P. Obj. 33. The court recognizes that the Plan does not address 4% LIHTC specifically, but ICP's objection does not identify a specific deficiency in the remedial plan that results from this omission. There are

distinctions between 4% and 9% LIHTC in that 4% LIHTC are available to all who qualify. Additionally, parts of the remedial plan would have the effect of promoting 4% LIHTC in predominantly Caucasian areas (e.g., criteria for dis-qualifying proposed sites with undesirable features). Accordingly, the court will consider the adequacy of the remedial plan in relation to 4% LIHTC as part of its annual review process.

ICP next contends that, although TDHCA suggests one change to its threshold criteria-the exclusion of proposed devel-opment sites that have undesirable features-TDHCA should propose additional amendments to the threshold criteria in order to mitigate the disparate impact. ICP also proposes revaluing points to increase the weight of below-the-line criteria, especially criteria that would reduce the disparate impact. The court agrees that these changes *could* reduce the disparate impact, but it is unclear whether their adoption is *necessary* to reduce the disparate impact. The court will instead consider these proposals as part of its annual review process.

ICP also asserts that the use of TDHCA's discretion should be included in the remedial plan. The court has already declined to accept this argument.


## VII

In the judgment filed today, the court implements the remedial plan adopted in this memorandum opinion and order and retains jurisdiction over this case for a period of five years after the first annual report is filed. Although no party moves for a temporal limit on the court-ordered remedy, the court concludes that one is necessary. *See, e.g., Ueno v. Napolitano,* 2007 WL 1395517, at *6 (E.D.N.Y. May 11, 2007), *rec. adopted,* (E.D.N.Y. May 11, 2007) (although plaintiffs did not state a time-limit for injunctive relief, adopting a three-year limitation period because otherwise, "[t]he court would be overseeing the defendants' rental activities for the rest of their lives"). The court, in its discretion, adopts a five-year limitation period. *Cf. United States v. Real Estate One, Inc.,* 433 F.Supp. 1140, 1156 (E.D.Mich.1977) (ordering that defend-ants provide annual reports detailing manner in which they had complied with judgment and directing that "[t]he report-ing aspects of the injunction may terminate after five (5) full years of substantial compliance with the terms hereof). The court finds that such a period will be sufficient to "insur[e] that no future violations of the [FHA] occur and remov[e] any lingering effects of past discrimination." *See Jamestown,* 557 F.2d at 1080 (collecting cases); *see also Ueno,* 2007 WL 1395517, at *6 (adopting three-year limitation period because, *inter alia,* it "should ... be enough time to monitor the defendants' rental practices to ensure that they are not discriminatory, while limiting the burden imposed upon the court as well as the defendants by the imposition of injunctive relief); *Rogers v. 66–36 Yellowstone Blvd. Coop. Owners, Inc.,* 599 F.Supp. 79, 85–86 (E.D.N.Y.1984) (recognizing that two years was best suited for advancement towards these two goals); *Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth.,* 493 F.Supp. 1225, 1251 (S.D.N.Y.1980) (holding that court had "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future") (quoting *Louisiana v. UnitedStates,* 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965)).

**\*15** The court finds that a five-year period is necessary because progress toward ensuring that no future violations of the FHA occur and of removing any lingering effects of past discrimination will be measured according to reports of LIHTC awards that (as to 9% tax credits) are made on an annual cycle. And because various factors can influence where appli-cants choose to develop projects in a particular annual cycle, the court must have a sufficiently broad empirical basis to enable it to assess whether the FHA violation in this case has in fact been remedied. By retaining jurisdiction for five years, the court will be able to evaluate the impact of several QAPs on the allocation of LIHTC. *Cf. Rogers,* 599 F.Supp. at 85–86 (recognizing that one-year duration for injunctive order would not be sufficient to permit a "newly implanted open housing program to take root"). During this period, the parties will have opportunities to request modifications to the remedial plan. This will enable the court to reduce TDHCA's remedial obligations in fewer than five years if they are

no longer warranted, or to increase the remedial requirements in the plan now adopted that do have the intended effect of ensuring that no future violations of the FHA occur and removing any lingering effects of past discrimination.

* * *

For the reasons explained, the court adopts in part TDHCA's Plan, and it enters judgment today in accordance with its memorandum opinions and orders in this case and the remedial plan adopted today.

**SO ORDERED.**

All Citations

Not Reported in F.Supp.2d, 2012 WL 3201401

## Footnotes

[1]     On August 3, 2012 FRI filed a motion for leave to file supplement to objections to defendants' proposed remedial plan, which the court has granted today. Although the court has considered the supplement to objections and brief in adopting the remedial plan, because nothing in them changes the reasoning or decisions of this memorandum opinion and order, the court will not separately discuss the supplement to objections and brief.

[2]     Although TDHCA functions on a statewide basis, its obligation under this remedy extends only to the Dallas metropolitan area because ICP's disparate impact claim is founded solely on that region. *See Brinkman,* 433 U.S. at 420 ("[O]nly if there has been a systemwide impact may there be a systemwide remedy."); *see also Home v. Flores,* 557 U.S. 433, 129 S.Ct. 2579, 2607, 174 L.Ed.2d 406 (2009) (because violation was proved only as to single district, vacating statewide injunction to extent it extended beyond district on grounds that "a statewide injunction ... intruded deeply into the State's budgetary processes" and "obscured accountability for the drastic remedy" since the state legislature or state courts have the authority to decide this issue and not the lower court). The court concludes that the remedy ordered by this court does not apply statewide. *Cf.* Ds. Plan 19 ("[TDHCA] will endeavor to apply the principles and objectives in this Plan on a statewide basis."). This does not bar TDHCA from following its usual processes to apply this remedy to areas outside of the Dallas metropolitan area. The court, however, cannot order a statewide remedy, which would circumvent TDHCA's usual processes, because it must be careful to minimize federal intrusion and to decree a remedy only to the extent it will cure the violation. *See, e.g., Brinkman,* 433 U.S. at 420; *Jamestown,* 557 F.2d at 1081; *United States v. W. Peachtree Tenth Corp.,* 437 F.2d 221, 228–29 (5th Cir.1971).

[3]     Based on Tex. Gov't Code Ann. § 2306.6724(f) (West 2008), the court anticipates that the 120–day deadline will occur 120 days after July 31 of the calendar year in question. If that date falls on a day when the clerk's office is closed, the report will be due the next day that the office is open.

[4]     TDHCA itself expressed a concern that these data were not consistent with the expressed preferences of Congress set forth in § 42. This concern was at least one reason why TDHCA included the revitalization index in its proposed remedy.

[5]     "When a term goes undefined in a statute, [it is given] its ordinary meaning." *Taniguchi v. Kan Pacific Saipan, Ltd.,* U.S. ——, ——U.S. ——, ——, 132 S.Ct. 1997, 2002, 182 L.Ed.2d 903, —— (2012) (citing *Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995)) (using dictionaries to aid statutory interpretation).

[6]     Subject, at least, to the requirements of the FHA, a QAP *can* award additional points to revitalization projects, but § 42(m)(1)(B)(ii)(III) *does not require* that the QAP do so.

[7]     This is the only mandatory criterion related to revitalization, and TDHCA's 2012–13 QAP complies with this requirement.

[8]     FRI also relies on § 42(d)(5)(B)(i) and (ii) as evidence of Congressional intent to give preference during the selection process to developments in QCTs. The court disagrees. These provisions make eligible for additional tax deductions (by increasing the property's basis) developments in QCTs that have been selected to receive LIHTC. *See id.*

[9]     The court notes that TDHCA's scoring and ranking system only applies to 9% LIHTC. Applicants seeking 4% LIHTC are not subject to the scoring and ranking process that the court describes in this section.

[10]    The court notes that if TDHCA selected more projects than it could allocate LIHTC to, it would be required to allocate the LIHTC dollar amounts in accordance with § 42(m)(1)(B)(ii)(III).

[11]    The court has no occasion in this case to determine whether, because Texas law and the QAP effectively foreclose TDHCA from having to consider the preference mandated by § 42(m)(1)(B)(ii) (III), Texas law is in tension with the I.R.C., but, to the extent that they are in tension, federal law is paramount.

[12]    Because FRI's objections are based on an incorrect interpretation of § 42(m)(1)(B)(ii)(III), the court need not reach FRI's argument that the Plan is so vague that FRI and its experts have not had a meaningful opportunity to evaluate the proposed remedy. Even if FRI's experts were given additional time, FRI could not demonstrate that the remedy violates § 42(m)(1)(B) (ii)(III) because FRI only challenges how LIHTC developments are selected rather than how LIHTC dollar amounts are allocated among selected projects.

[13]    ICP also objects to including points in the "Opportunity Index" for proposed development sites in QCTs for which there is a concerted revitalization plan. It appears, however, that these points are not offered in the "Opportunity Index" but in the "Revitalization Index," which the court discusses *infra* at § V(E).

        ICP also contends that this proposal is insufficient because a "proposed plan that only adds below the line criteria and points to the current system will not bring the allocation process into compliance." P. Obj. 21. ICP asserts that the points should be revalued so that the HOA criterion will have a higher value in comparison to the other criteria. The court addresses this *infra* at § VI.

[14]    Moreover, while ICP maintains that the proposed 1 to 3 points are insubstantial, its argument and evidence do not demonstrate that 1 or 3 points will not reduce the disparate impact, albeit perhaps by a lesser extent.

[15]    Because the court is not including the "Revitahzation Index" in the remedy, it need not address ICP's other arguments related to the "Revitahzation Index."

[16]    As discussed *supra* at note 2, this does not preclude TDHCA from following its usual processes to include the "Revitahzation Index" in the QAP.

[17]    As discussed *supra* at notes 2 and 16, this does not preclude TDHCA from following its usual processes to include such enhancements in the QAP.

[18]    ICP contests the use of "over-concentration" in TDHCA's heading, which states: "Annual analysis of effectiveness of plan and continued development and enhancement of a policy of avoidance of over-concentration of [LIHTC]." Ds. Plan 18. ICP asserts that "[a]ny analysis using ... concentration and over-concentration will not assist in bringing TDHCA's allocation decisions into compliance with the [FHA]." P. Obj. 22. Instead, ICP maintains that the analysis should focus, not on concentration, but on disparate racial impact.

        Although the heading refers to the "over-concentration" of LIHTC, the content of TDHCA's proposal demonstrates that its focus is on disparate impact, given that TDHCA intends to examine the extent that its changes reduce the disparate impact and whether it is necessary to adopt additional changes. Moreover, after the court receives the annual report and any requested modifications to the remedial plan, it will review under court-approved procedures all relevant evidence to determine whether the remedial plan should be amended. If information as to over-concentration is relevant, TDHCA can present it for court consideration.

        ICP also requests that the annual report be used to request *the court* for modifications to the remedial plan. The court has established these procedures *supra* at § III.

[19]   TDHCA is not precluded from implementing this proposal after following its usual processes. *See supra* at notes 2, 16, and 17.

End of Document                                               © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 2

2021 WL 2068261
Only the Westlaw citation is currently available.
United States District Court, N.D. Georgia, Atlanta Division.

Abby MARTIN, Los Angeles County, California, Plaintiff,

v.

Steve WRIGLEY, Chancellor for the Board of Regents of the University System of Georgia, in his Official Capacity;
Kyle Marrero, President of Georgia Southern University, in his Official Capacity; Bonnie Overstreet, Conference
Services Manager for Georgia Southern University, in her Individual Capacity; Michel Blitch, Conference Services
Coordinator for Georgia Southern University, in her Individual Capacity; and Sandra Lensch, Conference Services
Specialist for Georgia Southern University, in her Individual Capacity, Defendants.

CIVIL ACTION FILE NO. 1:20-CV-596-MHC
|
Signed 05/21/2021

**Synopsis**
**Background:** Journalist filed § 1983 action alleging that university officials prevented her from giving speech at university
based on Georgia statute prohibiting state from entering into contracts with individuals engaged in boycott of Israel, in
violation of her rights to freedom of speech, freedom of association, and due process. Defendants moved to dismiss.

**Holdings:** The District Court, Mark H. Cohen, J., held that:

[1] statute implicated contractors' First Amendment free speech rights;

[2] statute was content-based;

[3] journalist pled plausible First Amendment free speech claim

[4] journalist pled plausible First Amendment compelled speech claim;

[5] journalist pled plausible void for vagueness claim; and

[6] officials were entitled to qualified immunity.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

Edward Terkeel Mitchell, III, Murtaza Waqas Khwaja, Georgia Chapter of the Council on American Islamic Relations,
Atlanta, GA, Gadeir I. Abbas, Pro Hac Vice, Justin Sadowsky, Pro Hac Vice, Lena F. Masri, Pro Hac Vice, Cair Legal
Defense Fund, Mara E. Verheyden-Hilliard, Partnership for Civil Justice Fund, Washington, DC, for Plaintiff.

Deborah Nolan Gore, State of Georgia, Atlanta, GA, for Defendants Steve Wrigley, Kyle Marrero.

## ORDER

MARK H. COHEN, United States District Judge

**\*1** This case comes before the Court on Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("Mot. to Dismiss") [Doc. 37].

## I. BACKGROUND[1]

Plaintiff Abby Martin ("Martin") is a journalist who frequently expresses views in support of the rights of Palestinians and the Boycott, Divestment, Sanctions ("BDS") movement, which supports a political and economic boycott of Israel based on actions taken by the Israeli government with respect to its occupation of Palestinian territory. First Am. Compl. ("Am. Compl.") [Doc. 26] ¶¶ 4, 21. On July 19, 2019, Georgia Southern University ("GSU") invited Martin to speak at the 2020 International Critical Media Literary Conference (the "Conference"), which was to be hosted by GSU. Id. ¶ 5. Martin accepted the invitation. Id. One week later, a professor at GSU and conference co-chair emailed several professors at other academic institutions to inform them that Martin had been selected as the keynote speaker for the Conference. Id. ¶ 40. In that email, the professor referred to Martin as a "fantastic Key Note," and planning for the Conference continued. Id. ¶¶ 40-41.

On September 11, 2019, Defendants Overstreet, Blitch, and Lensch, on behalf of Defendants Wrigley and Marrero, sent Martin an agreement for her engagement as an independent contractor to provide her keynote presentation in exchange for a $1,000 honorarium as well as costs of travel and lodging. Id. ¶¶ 5, 42. On September 18, 2019, Defendants Overstreet, Blitch, and Lensch wrote Martin again to "draw [her] attention [to] legal language that the University and State of Georgia require us to include" and to state that her invitation would be honored only "[i]f this language is acceptable." Id. ¶¶ 43-44. The language referenced in the agreement was the following clause: "You certify that you are not currently engaged in, and agree for the duration of this agreement not to engage in, a boycott of Israel, as defined in 🏷 O.C.G.A. Section 50-5-85." Id. ¶¶ 5, 43. This certification was required pursuant to Georgia Senate Bill 327, codified as 🏷 O.C.G.A. § 50-5-85, which became effective on May 9, 2017. Id. ¶¶ 3, 43, 49-50. 🏷 O.C.G.A. § 50-5-85 provides, in pertinent part, as follows:

> The state shall not enter into a contract with an individual or company if the contract is related to construction or the provision of services, supplies, or information technology unless the contract includes a written certification that such individual or company is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel.

🏷 O.C.G.A. § 50-5-85(b). The law defines "Boycott of Israel" to mean

engaging in refusals to deal with, terminating business activities with, or other actions that are intended to limit commercial relations with Israel or individuals or companies doing business in Israel or in Israeli-controlled territories, when such actions are taken:

> **\*2** (A) In compliance or adherence to calls for a boycott of Israel other than those boycotts to which 50 U.S.C. App. Section 2407(c), as it existed on January 1, 2016, applies; or

> (B) In a manner that discriminates on the basis of nationality, national origin, religion, or other unreasonable basis that is not founded on a valid business reason.

O.C.G.A. § 50-5-85(a).

Martin responded the same day, stating: "I'm sure you know, a lot of my work advocates the boycott of Israel, and my new film features that call to action. I cannot sign any form promising not to boycott Israel." Id. ¶¶ 5, 45. As a result, Defendants prevented Martin from speaking at the Conference and receiving the $1,000 honorarium, and subsequently cancelled the Conference. Id. ¶¶ 6-7, 50, 52. As a result, Martin was deprived of her ability to speak on the GSU campus, to receive the honorarium, and to showcase her work. Id. ¶¶ 53-55. Martin, a frequent public speaker, alleges that she is likely to be prevented from speaking on other college campuses overseen by Wrigley. Id. ¶ 56.

On July 28, 2020, Martin filed her First Amended Complaint in the above-styled action alleging that O.C.G.A. § 50-5-85 violates the First and Fourteenth Amendments to the United States Constitution by impermissibly infringing on Martin's guaranteed rights to freedom of speech, freedom of association, and due process. Am. Compl. ¶¶ 57-95. Martin seeks, inter alia, an injunction against the continuing enforcement of the statute, a declaration that the statute is unconstitutional, and damages against Defendants Overstreet, Blitch, and Lensch in their individual capacities. Id., Prayer for Relief.


## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citation omitted). Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S.Ct. 1955.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not only must the court accept the well-pleaded allegations as true, but these allegations must also be construed in the light most favorable to the pleader. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011). However, the court need not accept legal conclusions, nor must it accept as true legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Thus, evaluation of a motion to dismiss requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679, 129 S.Ct. 1937.


## III. DISCUSSION

**\*3** [1]  [2] "It is well established that [ 42 U.S.C. §] 1983 itself creates no substantive rights; it merely provides a remedy for deprivations of federal rights established elsewhere." Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir. 1987) (citing City of Okla. City v. Tuttle, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). To sustain a cause of action based on section 1983, a litigant must establish two elements: (1) that she suffered a

deprivation of a right, privilege, or immunity protected by the U.S. Constitution or federal law, and (2) that the act or omission causing the deprivation was committed by a person acting under color of state law. Livadas v. Bradshaw, 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); Arrington v. Cobb Cnty., 139 F.3d 865, 872 (11th Cir. 1998). "[S]ection 1983 imposes liability only 'for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.' " Wideman, 826 F.2d at 1032 (quoting Baker v. McCollan, 443 U.S. 137, 146, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Accordingly, "[i]n any § 1983 action, a court must determine 'whether the Plaintiff has been deprived of a right secured by the Constitution and laws of the United States.' " Glenn v. Brumby, 663 F.3d 1312, 1315 (11th Cir. 2011) (quoting Baker, 443 U.S. at 146, 99 S.Ct. 2689). "Absent the existence of an underlying constitutional right, no section 1983 claim will lie." Wideman, 826 F.2d at 1032.

Martin asserts two causes of action under 42 U.S.C. § 1983, claiming that Defendants' enforcement of O.C.G.A. § 50-5-85 violates her First and Fourteenth Amendment rights to freedom of speech and assembly (Count One) and her Fourteenth Amendment right to due process (Count Two). Am. Compl. ¶¶ 57-95. Defendants contend that O.C.G.A. § 50-5-85 is constitutional, so that Martin's claims fail as a matter of law. Mot. to Dismiss.

**A. Martin's Complaint States a Claim Upon Which Relief Can Be Granted That O.C.G.A. § 50-5-85 Violates Martin's First and Fourteenth Amendment Rights to Freedom of Speech and Assembly.**

**1. Martin's Advocacy of a Boycott of Israel Constitutes Protected Activity Under the First Amendment.**

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, ... or the right of the people peaceably to assemble ...." U.S. Const. amend. I. The First Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. Schneider v. State of New Jersey, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

[3] The Supreme Court has held that state government employment cannot be conditioned "on taking oaths that impinge on rights guaranteed by the First and Fourteenth Amendments[.]" Cole v. Richardson, 405 U.S. 676, 680, 92 S.Ct. 1332, 31 L.Ed.2d 593 (1972). This same principle also applies to those contracting with the government, absent a special government interest. Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr, 518 U.S. 668, 677-78, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). The Supreme Court also has "long held ... that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses—so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 385, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

Defendants assert that this case is controlled by the Supreme Court's holding in Rumsfeld v. Forum for Acad. & Institutional Rights, Inc. ("FAIR"), 547 U.S. 47, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). Br. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Br.") [Doc. 37-1] at 5-9, 15-21. In FAIR, the Supreme Court addressed the constitutionality of the Solomon Amendment, which required universities receiving federal funding to grant military recruiters the same access to college campuses as provided to other recruiters. FAIR, 547 U.S. at 51, 126 S.Ct. 1297. A coalition of law schools and faculty members seeking to bar military recruiters' access to their campuses in protest of the military's discrimination based on sexual orientation filed a lawsuit claiming that the Solomon Amendment violated the First Amendment. Id. at 52, 126 S.Ct. 1297. The Supreme Court held that "[a]s a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." Id. at 60, 126 S.Ct. 1297. In particular, the Supreme Court noted that law schools were only compelled to provide minimal accommodations to military recruiters which were non-monetary and equal to the accommodations

extended to all employment recruiters on campus. Id. at 61 n.4, 126 S.Ct. 1297. Defendants also rely upon Int'l Longshoremen's Ass'n v. Allied Int'l, Inc., 456 U.S. 212, 226-27, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982), which held that "secondary picketing by labor unions" in violation of the National Labor Relations Act is not protected activity under the First Amendment. Defs.' Br. at 17-18.

**\*4** [4] Martin asserts that the controlling Supreme Court precedent that determines the unconstitutionality of O.C.G.A. § 50-5-85 under the First Amendment is NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). Br. in Opp'n of Defs.' Mot. to Dismiss ("Pl.'s Br.") [Doc. 43] at 6. In Claiborne, a Mississippi branch of the NAACP launched a boycott of white merchants in support of demands for racial equality and integration. Claiborne, 458 U.S. at 889, 899-900, 102 S.Ct. 3409. Actions taken in support of the boycott included nonviolent activities such as marches and picketing as well as violent enforcement against boycott violators which allegedly included damage to property and even physical assault. Id. at 902-05, 102 S.Ct. 3409. The Supreme Court held that "the non-violent elements of [boycotters]' activities are entitled to protection of the First Amendment." Id. at 915, 102 S.Ct. 3409. The opinion did not address whether this protection extended to "a narrowly tailored statute designed to prohibit certain forms of anticompetitive conduct or certain types of secondary pressure."[2] Id. at 915, n.49, 102 S.Ct. 3409. However, "[t]he right of the States to regulate economic activity could not justify a complete prohibition against a non-violent, politically motivated boycott designed to force governmental change and effectuate rights guaranteed by the Constitution itself." Id. at 914, 102 S.Ct. 3409.

Defendants' argument that FAIR and Int'l Longshoremen rather than Claiborne govern as to whether O.C.G.A. § 50-5-85 infringes on Martin's First Amendment rights fails. FAIR is distinguishable because the Solomon Amendment, in contrast to O.C.G.A. § 50-5-85, was aimed at changing the "result achieved" by the law schools' recruiting policy rather than the content of such policies. FAIR, 547 U.S. at 57, 126 S.Ct. 1297. O.C.G.A. § 50-5-85, on the other hand, focuses exclusively on the motive behind an individual's refusal to deal with Israel rather than the result achieved by any boycott. See O.C.G.A. § 50-5-85(a)(1)(B) (allowing contractors to refuse to deal with or terminate business activities with Israel as long as their action is "founded on a valid business reason."). Because O.C.G.A. § 50-5-85 allows or prohibits the same conduct depending solely on the motive behind it, it is the content of behavior rather than the result that this statute purports to regulate. Int'l Longshoremen also is distinguishable because the Supreme Court's holding in that case was limited to secondary picketing and boycotts in the labor union context which threatened to infringe upon the rights of others. Int'l Longshoremen, 456 U.S. at 226-27, 102 S.Ct. 1656.

In fact, Defendants' argument has been rejected in other cases addressing state statutes similar to O.C.G.A. § 50-5-85, where it has been held that the type of restriction imposed upon Martin involves protected expression under the First Amendment. In Jordahl v. Brnovich, 336 F. Supp. 3d 1016 (D. Ariz. 2018), vacated and remanded, 789 F. App'x 589 (9th Cir. 2020),[3] the district court considered the Arizona statute which prohibited public entities from contracting with companies that engage in boycotts of Israel. The district court in Jordahl rejected the defendants' reliance on FAIR and Int'l Longshoremen and instead relied upon Claiborne to hold that the conduct evidenced by the boycotting of consumer goods and services offered by businesses that support Israel's occupation of Palestinian territories is deserving of First Amendment protection:

> In accordance with Claiborne, these types of boycotting activities, which clearly include "the practice of persons sharing common views banding together to achieve a common end," are entitled constitutional protections. 458 U.S. at 907, 102 S.Ct. 3409. The Act here specifically and generally enumerates certain activity companies cannot engage in if they wish to contract with a public entity. Specifically, the Act prohibits companies from "engaging in a refusal to deal," "terminating business activities" or "performing *other actions* that are intended to limit commercial relations." A.R.S. § 35-393(1) (emphasis added). These actions, however, are only prohibited when taken "in compliance with or adherence to calls for a boycott of Israel." Id. The language of the Act thus necessarily contemplates

prohibiting collective conduct aimed "to achieve a common end"; here, a "boycott of Israel." 458 U.S. at 907-08, 102 S.Ct. 3409.

**\*5** \*\*\*

A restriction of one's ability to participate in collective calls to oppose Israel unquestionably burdens the protected expression of companies wishing to engage in such a boycott. The type of collective action targeted by the Act specifically implicates the rights of assembly and association that Americans and Arizonans use "to bring about political, social, and economic change." Claiborne, 458 U.S. at 911, 102 S.Ct. 3409 (stating "[t]he established elements of speech, assembly, association, and petition, though not identical, are inseparable") (internal quotation omitted) .... Under Claiborne, this conduct is deserving of First Amendment protection. Plaintiffs claim is therefore not foreclosed by Int'l Longshoremen.

Id. at 1042-43 (parallel citations omitted).

In Amawi v. Pflugerville Indep. Sch. Dist., 373 F. Supp. 3d 717 (W.D. Tex. 2019), vacated and remanded sub nom. Amawi v. Paxton, 956 F.3d 816 (5th Cir. 2020),[4] Texas enacted an "anti-BDS" statute to prohibit the boycotting of Israel as a condition of public employment. The district court in Amawi concluded that the boycotts against Israel were inherently expressive conduct and protected speech:

Claiborne, not FAIR, governs this case. Texas does not dispute that Plaintiffs' boycotts are political; they support the BDS movement's "dispute with the Israeli government's policies." (Texas Resp. Mots. Dismiss, Dkt. 25, at 18). Claiborne deals with political boycotts; FAIR, in contrast, is not about boycotts at all. The Supreme Court did not treat the FAIR plaintiffs' conduct as a boycott: the word "boycott" appears nowhere in the opinion, the decision to withhold patronage is not implicated, and Claiborne, the key decision recognizing that the First Amendment protects political boycotts, is not discussed.

\*\*\*

The statute defines "boycott Israel" according to the expressive purpose behind the refusal to buy things. See Tex. Gov. Code § 808.001 ("boycott Israel" defined to mean "refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict harm on, or limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory"). And it expressly exempts refusing to contract with Israel "for ordinary business purposes." Id. Accordingly, H.B. 89's no-boycott provision applies by its express terms *only* to expressive conduct.

Id. at 743-45.

Koontz v. Watson, 283 F. Supp. 3d 1007 (D. Kan. 2018), reviewed Kansas's law requiring all persons who contract with the state to certify that they are not engaged in a boycott of Israel. In granting a preliminary injunction, the district court again relied on Claiborne and distinguished FAIR:

**\*6** The conduct prohibited by the Kansas Law is protected for the same reason as the boycotters' conduct in Claiborne was protected.

The Kansas Law here is different than the requirement at issue in [FAIR]. The conduct the Kansas Law aims to regulate is inherently expressive. See Claiborne, 458 U.S. at 907-08 [102 S.Ct. 3409]. It is easy enough to associate plaintiff's conduct with the message that the boycotters believe Israel should improve its treatment of Palestinians. And boycotts—like parades—have an expressive quality. Id. Forcing plaintiff to disown her boycott is akin to forcing

plaintiff to accommodate Kansas's message of support for Israel. Because the Kansas Law regulates inherently expressive conduct and forces plaintiff to accommodate Kansas's message, it is unlike the law at issue in [ FAIR].

Id. at 1022, 1024 (parallel citation omitted).

Defendants contend that these cases were wrongly decided and instead rely upon Ark. Times LP v. Waldrip, 362 F. Supp. 3d 617 (E.D. Ark. 2019), as a correct application of FAIR rather than Claiborne to "a very similar state law which likewise prohibits state entities from contracting with companies that boycott Israel." Defs.' Br. at 18-19. Defendants' position has been undermined by the recent reversal of the Waldrip district court's decision by the United States Court of Appeals for the Eighth Circuit, Ark. Times LP v. Waldrip, 988 F.3d 453 (8th Cir. 2021), which contains the following pertinent discussion:

The State says this case is indistinguishable from FAIR because a decision not to purchase Israeli goods, like the decision to bar military recruiters from campus, is "all but invisible absent explanatory speech." According to the State, "a boycott of Israel is [simply] not expressive conduct," and as such is not entitled to First Amendment protection. But the comparison is not an exact fit because FAIR did not concern a boycott. In FAIR, the Supreme Court addressed the Solomon Amendment, which gave universities "a choice: Either allow military recruiters the same access to students afforded any other recruiter or forgo certain federal funds." The Court thus focused narrowly on the law schools' conduct in relation to military recruiters and never characterized it more broadly as a "boycott." Here, we are faced with a statute that expressly concerns and prohibits "boycotts."

Id. at 462. Like O.C.G.A. § 50-5-85, the Arkansas statute defined "boycott of Israel" to include "other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories." Id. at 464 (quoting Ark. Code Ann. § 25-1-502(a)(A)(i)).

Considering the Act as a whole, we conclude that the term "other actions" in the definition of "boycott Israel" and "boycott of Israel" encompasses more than "commercial conduct" similar to refusing to deal or terminating business activities. Instead, the Act requires government contractors, as a condition of contracting with Arkansas, not to engage in economic refusals to deal with Israel *and* to limit their support and promotion of boycotts of Israel. As such, the Act restricts government contractors' ability to participate in speech and other protected, boycott-associated activities recognized by the Supreme Court in Claiborne. See 458 U.S. at 915, 102 S.Ct. 3409. Therefore, the Act imposes a condition on government contractors that implicates their First Amendment rights.

*7 Id. at 466-67 (footnote and parallel citation omitted).

[5] Like the decisions reviewing anti-boycotting statutes in Jordahl, Amawi, Koontz, and Waldrip, this Court concludes that O.C.G.A. § 50-5-85 imposes a condition on those who contract with the state of Georgia that implicates the contractors' First Amendment rights.

## 2. O.C.G.A. § 50-5-85 Burdens Martin's Speech and Is Not Narrowly Tailored to Further a Substantial State Interest.

[6]  [7]  [8] Statutes which create a content-neutral, incidental burden on speech are permissible if the statute furthers a substantial governmental interest and the burden is no greater than necessary to further the interest. See United States v. O'Brien, 391 U.S. 367, 376-77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In contrast, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the

government proves that they are narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015) (citations omitted); see also Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."). A statute defining regulated speech by its function or purpose draws a distinction based on its message and, accordingly, is a content-based regulation subject to strict scrutiny. Reed, 576 U.S. at 164, 135 S.Ct. 2218.

Defendants contend that any burden imposed upon speech by O.C.G.A. § 50-5-85 is neutral and incidental. Defs.' Br. at 21-22. In addition, Defendants assert that O.C.G.A. § 50-5-85 "promotes a substantial state interest—namely, Georgia's interest in helping advance a long-standing federal foreign policy goal." Id. at 23-24. In response, Martin contends that O.C.G.A. § 50-5-85 burdens speech and the state's purported interest is nothing more than a mechanism for stifling expression. Pl.'s Br. at 13-16.

[9] O.C.G.A. § 50-5-85 is content-based because the statute exempts boycotts of Israel that are "founded on a valid business reason." O.C.G.A. § 50-5-85(a)(1)(B). Therefore, whether the state of Georgia will enter into an agreement with a contractor that refuses to engage in business with Israel is premised entirely upon the motive behind the contractor's decision.

[10] [11] Because the burden on speech imposed by O.C.G.A. § 50-5-85 is content-based, it is subject to strict scrutiny. Reed, 576 U.S. at 164, 171, 135 S.Ct. 2218. This means that the government must show that the statute serves a compelling governmental interest and that any burden on speech be essential and narrowly tailored to further that interest. Id. at 171, 135 S.Ct. 2218 (citing Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 564 U.S. 721, 734, 131 S.Ct. 2806, 180 L.Ed.2d 664 (2011)). Even assuming that Georgia's interest in furthering foreign policy goals regarding relations with Israel is a substantial state interest, Defendants fail to explain how Martin's advocacy of a boycott of Israel has any bearing on Georgia's ability to advance foreign policy goals with Israel. The law also is not narrowly tailored to achieve the state's purported interest for the same reasons that Kansas's law was enjoined:

*8 But even if one assumed that Kansas had passed the law to achieve constitutionally permissible goals that would not change the outcome here. It is still unconstitutional because it is not narrowly tailored to achieve those permissive goals. If Kansas had passed its law to regulate boycotts intended to suppress economic competition coming from Israel—a goal that Claiborne permits—the Kansas Law is overinclusive. It is overinclusive because it also bans political boycotts, which is impermissible. See Garrison v. Louisiana, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("[S]peech concerning public affairs is more than selfexpression; it is the essence of self-government."). Likewise, if the Kansas Law's goal is to promote trade relations with Israel—also a permissible goal—the Kansas Law is underinclusive because it only regulates boycotts but does not regulate other conduct that affects trade.

Koontz, 283 F. Supp. 3d at 1023 (parallel citation omitted).

The Court notes that, even if it were to apply intermediate scrutiny pursuant to O'Brien, as Defendants would have this Court do, the factors still weigh in favor of Martin. See Defs.' Br. at 21 (citing O'Brien, 391 U.S. at 377, 88 S.Ct. 1673). "[The Supreme] Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." O'Brien, 391 U.S. at 376, 88 S.Ct. 1673. In such a case, the Constitution requires that "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest" and that "the governmental interest is unrelated to the suppression of free expression." Id. at 377, 88 S.Ct. 1673.

However, the Supreme Court also has held that a facially speech-neutral statute may still encroach upon activity protected by the First Amendment. United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 469-70, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). In Nat'l Treasury, the Supreme Court held that even though a statute was content-neutral, the indirect burden of banning honoraria given to government employees for public speaking or publication would "chill[ ] potential speech before it happens" and disincentivize government employees from public expression. Nat'l Treasury, 513 U.S. at 468-71, 115 S.Ct. 1003. Here, O.C.G.A. § 50-5-85 has a similar chilling effect because, as alleged in the First Amended Complaint, the statute effectively bans Martin from speaking at GSU and presumably other state university campuses. Moreover, O.C.G.A. § 50-5-85 arguably is more offensive to the First Amendment than the statute in Nat'l Treasury because it burdens speech exclusively for those who hold particular political beliefs. Accordingly, even under Defendants' proposed intermediate scrutiny test, O.C.G.A. § 50-5-85 places an unconstitutional incidental burden on speech.

Because O.C.G.A. § 50-5-85 prohibits inherently expressive conduct protected by the First Amendment, burdens Martin's right to free speech, and is not narrowly tailored to further a substantial state interest, Defendant's Motion to Dismiss Count One of the First Amended Complaint is **DENIED.**

### 3. The Statute Unconstitutionally Compels Speech.

[12] The requirement contained in O.C.G.A. § 50-5-85 that parties seeking to contract with the state of Georgia sign a certification that they are not engaged in a boycott of Israel also is unconstitutional compelled speech. "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment. Broad and sweeping state inquiries into these protected areas ... discourage citizens from exercising rights protected by the Constitution." Baird v. State Bar of Ariz., 401 U.S. 1, 6, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971). "Similarly, the State may not condition employment 'on an oath denying past, or abjuring future,' protected speech and associational activities." Amawi, 373 F. Supp. 3d at 754 (quoting Cole, 405 U.S. at 680, 92 S.Ct. 1332).

*9 Because O.C.G.A. § 50-5-85 discriminates based on the motive for engaging in a boycott against Israel, the certification requirement forces parties contracting with the state of Georgia to publicly assign a motive and speech element to what Defendants deem merely economic conduct. The certification that one is not engaged in a boycott of Israel is no different that requiring a person to espouse certain political beliefs or to engage in certain political associations. The Supreme Court has found similar requirements to be unconstitutional on their face. See, e.g., Baird, 401 U.S. at 5-6, 91 S.Ct. 702 (holding unconstitutional a state bar question requiring applicants to state whether they had ever been a member of the Communist Party or another organization which advocated the overthrow of the United States Government by force).

### B. Martin States a Claim Upon Which Relief Can Be Granted That O.C.G.A. § 50-5-85 Violates Martin's Right to Due Process Under the Fourteenth Amendment.

[13] In cases arising under the First Amendment, courts "are concerned with the vagueness of a statute 'on its face' because such vagueness may in itself deter constitutionally protected and socially desirable conduct." United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 36, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); see also Amawi, 373 F. Supp. 3d at 756 (quoting Smith v. Goguen, 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974)) ("When dealing with a statute 'capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.' "). A statute is impermissibly vague when people of common intelligence are left to

guess at its precise meaning or when the standard of conduct is not specified. Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

[14] Here, O.C.G.A. § 50-5-85's inclusion of "other actions that are intended to limit commercial relations with Israel" makes the statute impermissibly vague. O.C.G.A. § 50-5-85. This phrase in particular may leave a reasonable individual to speculate as to what conduct is prohibited. See Waldrip, 988 F.3d at 466 ("a contractor could readily conclude that it was prohibited from both refusing to economically engage with Israel *and* supporting or promoting a boycott of Israel or Israeli-goods. A contractor that does not want to risk violating the terms of its contract would likely refrain even from activity that is constitutionally protected."). Despite Defendants' contentions to the contrary, the language in O.C.G.A. § 50-5-85 makes it questionable whether Martin even would be permitted to speak publicly in support of BDS Boycotts while she was engaged in any contract with the state of Georgia. Public speech which advocates for a boycott of Israel and calls on others to engage in BDS Boycotts could reasonably be interpreted as "actions that are intended to limit commercial relations with Israel." O.C.G.A. § 50-5-85-85(a). Thus, Martin has sufficiently stated a claim that O.C.G.A. § 50-5-85 is void for vagueness in violation of the Fourteenth Amendment.

**C. Defendants Overstreet, Blitch, and Lensch Are Shielded From Liability for Damages in Their Individual Capacities Based Upon Qualified Immunity.**

Defendants also contend that, even if Martin has stated a claim under § 1983, Defendants Overstreet, Blitch, and Lensch (collectively, the "Individual Defendants") are entitled to qualified immunity from suit in their individual capacities because the alleged constitutional right was not clearly established. Defs.' Br. at 33-35. Martin contends that the Individual Defendants are not entitled to qualified immunity because Claiborne clearly establishes the constitutional violation in this case. Pl.'s Br. at 30.

[15] "Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). To claim qualified immunity, a defendant must first show he was performing a discretionary function. Barnes v. Zaccari, 669 F.3d 1295, 1303 (11th Cir. 2012). There is no dispute that the Individual Defendants were acting in the scope of their discretionary authority in this case.[5]

**\*10** [16] [17] [18] [19] [20] "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." Edwards v. Shanley, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting Lewis v. City of W. Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009)). A plaintiff demonstrates that qualified immunity does not apply by showing: "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1254 (11th Cir. 2004). A constitutional right is clearly established "only if its contours are 'sufficiently clear that a reasonable official would understand what he is doing violates that right.' " Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "When we consider whether the law clearly established the relevant conduct as a constitutional violation at the time that [the government official] engaged in the challenged acts, we look for 'fair warning' to officers that the conduct at issue violated a constitutional right." Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)). There are three methods to show that the government official had fair warning:

First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary.

Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant State Supreme Court].

Terrell v. Smith, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (citations, quotation marks, and alterations omitted). The second and third methods, known as "obvious clarity" cases, exist when "case law is not needed" to demonstrate the unlawfulness of the conduct or where the existing case law is so obvious that "every reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Vinyard v. Wilson, 311 F.3d 1340, 1350-51 (11th Cir. 2002). Such cases are rare. See, e.g., Santamorena v. Georgia Military College, 147 F.3d 1337, 1340 n.6 (11th Cir. 1998) (noting that "these exceptional cases rarely arise").

[21] The law at issue in this case is similar to over thirty laws that have been enacted to restrict the ability of state contractors to support boycotts of Israel. See https://www.jewishvirtuallibrary.org/anti-bds-legislation (last visited May 21, 2021). Although there have been district court and courts of appeals decisions that have considered the constitutionality of these laws discussed by the Court in this Order, none of them came from the Supreme Court, the Eleventh Circuit, or the Supreme Court of Georgia. Martin contends that Claiborne established the broad principle which controls the analysis of the review of O.C.G.A. § 50-5-85; however, the analysis undertaken in the cases previously decided involving "anti-BDS" laws indicates that determination of whether Georgia's law is unconstitutional is not "clearly established." Indeed, in the one circuit court of appeals case that has considered the merits of a similar law, there was a disagreement among the panel members as to the correct outcome. See Waldrip, 988 F.3d at 467 (Kobes, J., dissenting).

[22] It is unreasonable to expect that the Individual Defendants in this case would have been on notice that O.C.G.A. § 50-5-85 was unconstitutional based upon the application of Claiborne to the specific facts of this case. "[C]learly established law should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case." White v. Pauly, —— U.S. ——, 137 S. Ct. 548, 552, 196 L.Ed.2d 463 (2017) (citations omitted). And this is not an "obvious clarity" case where case law is not necessary to establish the unlawfulness of Defendants' actions.

> *11 As noted, to establish fair warning under this method, plaintiff may point to prior case law (from the Supreme Court of the United States, the Eleventh Circuit, or the highest court in the relevant state) that is materially similar. This method requires us to consider whether the factual scenario that the official faced is fairly distinguishable from the circumstances facing a government official in a previous case. Although existing case law does not necessarily have to be directly on point, it must be close enough to have put the statutory or constitutional question beyond debate. If reasonable people can differ on the lawfulness of a government official's actions despite existing case law, he did not have fair warning and is entitled to qualified immunity. This court has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.

Gaines v. Wardynski, 871 F.3d 1203, 1209-10 (11th Cir. 2017) (citations and punctuation omitted). "It is particularly difficult to overcome the qualified immunity defense in the First Amendment context." Id. at 1210 (citations omitted).

None of the cases Martin cites in her response are particularized to the facts of this case or are close enough to have put the constitutional question "beyond debate." Pl.'s Br. at 34-35. Consequently, she has not carried her burden of showing that the Individual Defendants violated a clearly established constitutional right. Accordingly, Defendants' Motion to Dismiss is **GRANTED** as to Defendants Overstreet, Blitch, and Lensch in their individual capacities.

# IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion to Dismiss for Failure to State a Claim [Doc. 37] is **GRANTED IN PART and DENIED IN PART.** Defendants' Motion is **GRANTED** with respect to Martin's claims against Overstreet, Blitch, and Lensch in their individual capacities, and those Defendants are **DISMISSED.** Defendants' Motion is otherwise **DENIED.**

**IT IS SO ORDERED** this 21ˢᵗ day of May, 2021.

**All Citations**

--- F.Supp.3d ----, 2021 WL 2068261

## Footnotes

[1]   Because this case is before the Court on a motion to dismiss, the facts are presented as alleged in Plaintiff's Complaint. Silberman v. Miami Dade Transit, 927 F.3d 1123, 1128 (11th Cir. 2019) (citation omitted).

[2]   Subsequent to Claiborne, the Supreme Court distinguished boycotts for political reasons from those conducted for economic reasons. F.T.C. v. Superior Ct. Trial Laws. Ass'n, 493 U.S. 411, 427, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). In Trial Laws., the Court distinguished political boycotts such as the one in Claiborne with boycotts seeking to gain an economic advantage for boycott participants. Trial Laws., 493 U.S. at 426, 110 S.Ct. 768. The boycotts prohibited by O.C.G.A. § 50-5-85, in contrast, are political boycotts. See O.C.G.A. § 50-5-85(a)(1)(B) (excluding from the definition of "Boycott of Israel" any refusal to deal "founded on a valid business reason."). Accordingly, the boycotts at issue here do not fall under the reserved question in Claiborne.

[3]   Jordahl was vacated and remanded after the Arizona legislature revised the statute at issue, which mooted the underlying claims. See Jordahl v. Brnovich, 789 F. App'x 589 (9th Cir. 2020).

[4]   Amawi was vacated and remanded after the Texas legislature revised the statute at issue, which mooted the underlying claims. See Amawi v. Paxton, 956 F.3d 816 (5th Cir. 2020).

[5]   Martin does not respond to Defendants' assertion that the Individual Defendants were acting within the scope of their discretionary authority. See Pl.'s Br. at 30-31.

© 2021 Thomson Reuters. No claim to original U.S. Government Works.