United States District Court
Southern District of Texas
**ENTERED**
January 28, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| A & R ENGINEERING AND TESTING, INC., | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO. 4:21-CV-03577 |
| CITY OF HOUSTON and KEN PAXTON, *in his official capacity as Attorney General of Texas,* | § § § § § | |
| *Defendants.* | § § | |

## ORDER

The State of Texas ("Texas" or "Defendant") enacted a law that in relevant part specifies:

"A governmental entity may not enter into a contract with a company for goods or services unless

the contract contains a written verification from the company that it: (1) does not boycott Israel;

and (2) will not boycott Israel during the term of the contract." Tex. Gov't. Code § 2271.002(b)

("Chapter 2271"). Plaintiff A & R Engineering and Testing, Inc. ("A&R" or "Plaintiff") is a

company that has done business with the City of Houston ("Houston") in the past and wants to

continue to do so. Its contract is up for renewal, and Houston has tendered A&R a new contract,

which contains language requiring A&R to certify it does not and will not boycott Israel. While

A&R wants to continue to work for Houston, it also wants to have the option to boycott Israel *and*

it wants to do so without worrying about any recriminations or a claim of breach of contract. It

does not complain about any other provisions of the pending contract. In order for A&R to honor

its contract and be able to boycott, it wants this Court to find Chapter 2271 of the Texas

Government Code unconstitutional as infringing on its First Amendment rights. Texas wants

Chapter 2271 to remain in force and does not want taxpayer funds going to those who discriminate

against Israel. Houston wants to comply with the law and is willing to employ A&R if it can do so legally. Otherwise, Houston does not have a dog in the fight.

This fact pattern concerns a legal question that is surprisingly perplexing, though not uncommon. This lawsuit is one of many filed nationwide seeking to set aside pieces of legislation passed in various states known as "Anti-BDS laws," which preclude a person or entity receiving government funds from boycotting Israel. More than a few courts have addressed this issue, and their decisions have not been necessarily uniform.

For instance, one of the Court's colleagues on the district bench in Arkansas was called upon to address a similar issue. He began his opinion:

> I routinely instruct jurors to follow my instructions on the law, even if they thought the law was different or think it should be different. This case presents an occasion in which I must follow the same principle, which is that I have a duty to follow the law even though, before researching the issue, I thought the law required a different outcome than the one ultimately reached.

*Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d 617, 619 (E.D. Ark. 2019), *rev'd and remanded*, 988 F.3d 453 (8th Cir. 2021), *reh'g en banc granted, opinion vacated* (June 10, 2021). This is about as good a "teaser" as one can use to begin an opinion.

A colleague in the Western District of Texas began his order with a less provocative, but more direct, introduction of the primary issue that it had before it:

> This case is about whether Texas may prohibit boycotting the State of Israel as a condition of public employment. Plaintiffs in this case are all participants or supporters of the "BDS" movement. The BDS movement—referring to boycotts, divestment, and sanctions—arose in response to Israel's occupation of Palestinian territory and its treatment of Palestinian citizens and refugees.

*Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717, 730 (W.D. Tex. 2019).

Both judges accurately described the same issue in their well-reasoned opinions (albeit the Arkansas case dealt with an Arkansas law). Both considered in depth the possible implications that

an Anti-BDS law might have on First Amendment rights. Yet they reached opposite conclusions. This issue has confounded more than a few judges, and there seems to be no consensus. The *Arkansas Times* case demonstrates the schism. The district court's decision was reversed by the Eighth Circuit in a 2–1 decision. That decision has since been vacated, and it is now set for *en banc* consideration. *See Arkansas Times LP v. Waldrip*, 988 F.3d 453, 464 (8th Cir. 2021), *reh'g en banc granted, opinion vacated* (June 10, 2021).

The fact that the two cases referenced above reached opposite conclusions is not a reflection on either jurist, as both are well-regarded members of the Judiciary. The differing results are indicative of how a seemingly simple fact pattern can encompass any number of complex legal issues—enough issues to puzzle even the most erudite professor of constitutional law. This opinion should accentuate that complexity, as the Court agrees with some aspects of each of the opinions.

Among the issues the Court will address is whether A&R has standing to bring this case and whether it has the right as a Texas corporation to claim the full panoply of protections found in the First Amendment. The Court will also need to decide if this issue is ripe. Assuming Plaintiff does have standing and that the issue is ripe, the Court will then address whether the First Amendment is implicated and, if so, the extent of its protection. The Court is also faced with the question of whether Texas can regulate how its taxpayers' dollars are used, and to whom they are given; and whether the Constitution requires Texas to fund activities with which it disagrees and that are actively contrary to the policies it is pursuing. There are many sub-issues as well, including: Is an economic boycott speech or association that falls under the penumbra of the First Amendment? Does Texas have a right to "punish" a company for exercising its First Amendment rights (as Plaintiff phrases it) or must Texas provide taxpayer funds to support Plaintiff's boycott

(as Texas might phrase it)? Stated another way, must Texas taxpayers support a cause they may or may not believe in and that is clearly at odds with Texas's current pursuit of business with Israel?

Plaintiff's owner, Ramsy Hassouna, has testified that he is not anti-Semitic, but that he is a proponent of the Boycott, Divestment, and Sanctions ("BDS") movement. The BDS movement allegedly seeks to apply international, nonviolent pressure on Israel, so long as it continues to occupy the West Bank, Gaza, and East Jerusalem. *What is BDS?*, https://bdsmovement.net/what-is-bds (last visited Jan. 25, 2022). Per its website, the BDS movement has three goals: (1) to end Israeli occupation of what it views as Palestinian land; (2) the recognition of "full equality" for Arab-Palestinian citizens of Israel; and (3) a guarantee that Palestinian refugees can return to the lands from which they were displaced following the establishment of Israel in 1948. *Id.* The organization that claims ownership of the BDS movement is the Palestinian BDS National Committee (BNC), a "coalition of Palestinian organisations [sic] that leads and supports the BDS movement," and the Palestinian Campaign for the Academic and Cultural Boycott of Israel (PACBI). *Id.* The BDS movement officially launched on July 9, 2005, the one-year anniversary of the International Court of Justice's advisory concerning the Gaza–Israel barrier. *See* Palestinian Civil Society, *Palestinian Civil Society Call for BDS*, BDS (July 9, 2005), https://bdsmovement.net/call; *see also* Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion, 2004 I.C.J. 3 (July 9). The BDS movement describes itself as "an inclusive, anti-racist human rights movement that is opposed on principle to all forms of discrimination, including anti-semitism and Islamaphobia." *What is BDS?*, https://bdsmovement.net/what-is-bds (last visited Jan. 25, 2022).

Others, however, describe this movement as being anti-Semitic. *See, e.g.*, *BDS: The Global Campaign to Delegitimize Israel*, ADL (last visited Jan. 25, 2022),

4

https://www.adl.org/resources/backgrounders/bds-the-global-campaign-to-delegitimize-israel;

Daniel Schwammenthal, *BDS is Antisemitic*, AM. JEWISH COMM. (Sept. 23, 2019),

https://www.ajc.org/news/bds-is-antisemitic. Consequently, whether accurate or not, the specter

of anti-Semitism overlays this entire situation.

Israel holds a unique position in the world as the only Jewish state. For centuries, the Jewish

people have suffered at the hands of anti-Semitic individuals and nations. In Europe, for example,

they have historically suffered pogrom after pogrom in one form or another, all of which

culminated in the Nazi-driven Holocaust. From the tragedy of the Holocaust, the nation of Israel

was born. *See Israeli Declaration of Independence*, KNESSET,

https://main.knesset.gov.il/en/about/pages/declaration.aspx (last visited Jan. 25, 2022).

Now, over 70 years later, the current political climate has given rise to an uptick in anti-

Semitic behavior, including some that clearly exceeds the protection of the First Amendment.[1]

This rise no doubt concerns not only Jews in Israel, but also those in the Jewish diaspora and those

who care about their wellbeing.

Hassouna, as a proponent of the BDS movement, describes the passage of the Texas law

in question (and those in other states) as a backlash against the BDS movement. He has personally

boycotted Israel, and the Complaint allows that A&R has as well. (Doc. No. 1, p. 8).[2] There is no

doubt some truth in this characterization of the motivating factor behind the actions taken by the

---

[1] This rise in anti-Semitic rhetoric and behavior seems to be a worldwide phenomenon. The risks involved in this kind of behavior was exemplified in Texas recently, where a gunman took hostages in a standoff in a synagogue. *See, e.g.*, Mark Oppenheimer, *The Growing Risk for Jews Who Show Their Jewishness*, WALL ST. J. (Jan. 19, 2022), https://www.wsj.com/articles/the-growing-risk-for-jews-who-show-their-jewishness-11642612115. This follows on the heels of tragedies in Poway, California, and Pittsburgh, Pennsylvania—both of which resulted in synagogue attendees being killed.

[2] While Plaintiff, in its Complaint, states that it boycotts Israel in its capacity as a corporation, Hassouna testified that A&R has never participated in a boycott. *See* (Doc. No. 31, p. 51). In any event, Hassouna has testified that his motivation for doing so was not based on any anti-Semitic sentiment. (*Id.* at 44).

Texas Legislature. Nevertheless, it would be a mistake to ignore the fact that many Americans support these laws, not necessarily out of opposition to the BDS movement, but out of a feeling that the movement is indicative of the rise of anti-Semitism worldwide. Stated differently, some Americans (including some here in Texas) equate a boycott against Israel to anti-Jewish sentiment, which they see as the equivalent of discrimination based upon one's religious preference, which Americans have traditionally abhorred.[3]

The Court does not have any evidence—or even what it considers to be authoritative articles—in the record before it that proves that the BDS movement or the Plaintiff in this case is anti-Semitic, but that does not refute the fact that many consider the BDS movement to be anti-Semitic. *See e.g.,* Zach Schapira, *Commentary: Israel Boycott Ban is Not About Free Speech,* REUTERS (Jan. 10, 2019), https://www.reuters.com/article/us-schapira-israel-commentary/commentary-israel-boycott-ban-is-not-about-free-speech-idUSKCN1P420Z ("The practical impact of BDS on Jews and Israelis in the United States is no less troubling. When companies and organizations engage in secondary boycotts of Israel, meaning they won't do business with entities that have a relationship with Israel, this disproportionately targets both Jewish and Israeli Americans."); LEONARD SAXE ET AL., HOTSPOTS OF ANTISEMITISM AND ANTI-ISRAEL SENTIMENT ON US CAMPUSES 1 (Cohen Ctr. for Modern Jewish Studies 2016) ("There has been widespread concern about antisemitism and anti-Israel sentiment on US college campuses. Attributed to the anti-Israel Boycott, Divestment, and Sanctions (BDS) movement, reports of antisemitic incidents on campus have increased."); STEFANY TRUESDELL, THE NATURE OF THE BDS MOVEMENT ON US COLLEGE CAMPUSES: A BRIEF ANALYSIS IN THREE CASE STUDIES 82

---

[3] While more suitable for a Law Review article, and so well beyond the confines of the legal issues presented here, is the fact that the House of Representatives just passed a bill to combat Islamophobia. *See* H.R. 5665, 117th Cong. (1st Sess. 2021). One wonders if the attacks being brought here by a BDS proponent would equally apply to it.

(Brandeis Univ. 2016) (There "appears to be a common thread among BDS supporting groups at the university level: that of using aggressive tactics to instill fear and unease in their classmates."). These sources are anecdotal, and it has not been suggested by any party that they are authoritative. Nevertheless, they do represent a valid point of view, and clearly Texas has an interest in protecting its Jewish residents *if* this movement is currently inspiring violence.

Hassouna denies any anti-Jewish motivation and testified that his desire to boycott has nothing to do with Jewish people (American or Israeli) but is only focused on the acts of the Israeli government. This Court has no evidence that undermines his testimony.[4] Nevertheless, the legislation at issue did not originate in an historical vacuum. While the current motivating factor for the anti-boycott legislation is probably the BDS movement, anyone with a basic knowledge of modern history knows that one of the first anti-Jewish acts taken by the Nazis after they took power in Germany was the boycott of Jewish businesses in 1933. One cannot be faulted then for having a concern that the suggested boycott is the first step on a very slippery slope. This concern is only enhanced by the number of anti-Jewish actions taken internationally over the last decade. *See e.g.,* Ahmed Shaheed (Special Rapporteur on Freedom of Religion of Belief), *Elimination of All Forms of Religious Intolerance,* U.N. Doc. A/74/358 (Sept. 20, 2019); *Commission Report on the Rise of Antisemitism Online During the Pandemic,* at 8, COM (Apr. 21, 2021), https://op.europa.eu/en/publication-detail/-/publication/d73c833f-c34c-11eb-a925-

---

[4] Some may consider Hassouna's distinction to be window dressing on an action otherwise laced with ill intent. This is especially true since one of the BDS founders has explicitly stated that the destruction of the State of Israel is a goal of the BDS Movement. STEFANY TRUESDELL, THE NATURE OF THE BDS MOVEMENT ON US COLLEGE CAMPUSES: A BRIEF ANALYSIS IN THREE CASE STUDIES 82 (Brandeis Univ. 2016) (citing AbuKhalil Asad, *A Critique of Norman Finkelstein on BDS,* AL AKHBAR ENGLISH (Feb. 17, 2012). Hassouna, however, is not the only one to make this distinction. The International Holocaust Remembrance Alliance's definition of anti-Semitic acts include "holding Jews collectively responsible for the actions of the State of Israel." *What is Antisemitism,* INT'L HOLOCAUST REMEMBRANCE ALL. (last visited Jan. 25, 2022), https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism; *see also Defining Anti-Semitism,* U.S. DEPT. OF STATE (June 8, 2010). These sources make the very distinction that Hassouna is making, and by doing so, they impliedly criticize those who do not draw the same line.

01aa75ed71a1/language-en; U.S. Comm'n on Civil Rights, Statement on Spike in Anti Semitism in United States Surrounding the Outbreak of Violence Between Israel and Hamas in May 2021 (July 23, 2021), https://www.usccr.gov/files/2021/07-23-Anti-Semitism-Statement-2021.pdf.

Thus, this issue is the combination of a politically sensitive/religiously controversial topic and a complicated First Amendment question, and that separates this case (and other similar cases)—and the issues involved—from the other fact patterns that implicate the First Amendment.

With this predicate, the Court has before it A&R's Motion for Preliminary Injunction (Doc. No. 7), Texas's Response in opposition, (Doc. No. 18), and the Plaintiff's Reply. (Doc. No. 20). Texas has also filed a Motion to Dismiss, (Doc. No. 17), to which A&R has responded in opposition, (Doc. No. 19), and Texas has replied. (Doc. No. 22). The Court held a hearing and took testimony on the motions. After reviewing each motion, the briefing, the testimony, and the relevant law, the Court grants in part and denies in part the Plaintiff's Motion for Preliminary Injunction and denies Texas's Motion to Dismiss.

## I.    Legal Standard

A preliminary injunction is an "extraordinary remedy" that should only be granted if the movant has "clearly carried the burden of persuasion" on all four factors. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003). The movant, however, "need not prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) (citing *H & W Indus. v. Formosa Plastics Corp.*, 860 F.2d 172, 179 (5th Cir. 1988)). Before a court will grant a preliminary injunction, the movants must clearly show:

> (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

8

*City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)); *see also Winter v. NRDC*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

## II.   Standing

Texas has raised a somewhat unusual standing objection in its Motion to Dismiss in that it questions some, but not all, of Plaintiff's ability to bring this case. Texas impliedly, if not explicitly, concedes that Plaintiff has standing to contest § 2271.001 *et seq.*, but it maintains Plaintiff has no right to challenge any other relevant provision (including those in § 808.001). Of course, a defendant's agreement to standing does not confer jurisdiction on a federal court where it does not otherwise exist. *See, e.g., Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–63 (1992). Thus, this Court must confirm that Plaintiff has standing in order to resolve not only Texas's Motion to Dismiss, but also to proceed to resolve the request for a preliminary injunction.

A. Applicable Legal Standards

1. *Article III Standing*

Article III of the United States Constitution requires that parties seeking to resolve disputes before a federal court present actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. This requirement limits "the business of federal courts to questions presented in an adversary

context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Plaintiffs, as the parties invoking the Court's jurisdiction, bear the burden of satisfying the Article III requirement by demonstrating that they have standing to adjudicate their claims in federal court. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The "irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. First, a plaintiff must demonstrate that they have "suffered a concrete and particularized injury that is either actual or imminent." *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007). Second, a plaintiff must show that there is a causal connection between the alleged injury and the complained-of conduct—essentially, that "the injury is fairly traceable to the defendant." *Id.* Finally, standing requires that the injury "be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).

### 2. *Prudential Standing*

In addition to these three constitutional requirements, "the federal judiciary has also adhered to a set of 'prudential' principles that bear on the question of standing." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982). Many opinions refer to those principles as being under the banner of "prudential" standing. *See, e.g., Bennett v. Spear*, 520 U.S. 154, 164 (1997). First, the Supreme Court has held that when the "asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone does not warrant exercise of jurisdiction." *Id.* Rather, these "abstract questions of wide public significance" are more appropriately left to the representative branches of the federal government. *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Second, the plaintiffs must come within the "zone of interests to be protected or regulated by the statute or

constitutional guarantee in question." *Valley Forge*, 454 U.S. at 475 (quoting *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Finally, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 474 (quoting *Warth*, 422 U.S. at 499).

B. Resolution of Standing Questions

Questions regarding constitutional and prudential standing implicate the court's subject-matter jurisdiction; thus, challenges to standing are evaluated as a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). When evaluating subject-matter jurisdiction, the court may consider "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161. The court's analysis also depends on whether the challenging party has a made a "facial" or "factual" attack on jurisdiction. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). A facial challenge consists of only a Rule 12(b)(1) motion without any accompanying evidence; for this challenge, the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true." *Id.*

Conversely, when making a factual attack on the court's jurisdiction, the challenging party may submit affidavits, testimony, or other evidentiary materials to support its claims. *Id.* A factual attack requires the responding plaintiff "to submit facts through some evidentiary method" and prove "by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Id.*

C. Standing Analysis

The Court finds that Plaintiff has Article III standing to bring forth this action. Plaintiff has

suffered, or may soon suffer, an injury by losing the opportunity to renew its contract with Houston. This injury is fairly traceable to Defendant's conduct because it is a direct result of the enactment of Chapter 2271 of the Texas Government Code, which prohibits a party to a government contract from boycotting Israel. As required by this law, Houston included this ban in the contract tendered to Plaintiff. A favorable decision by this Court would redress or prevent Plaintiff's injury. As such, Plaintiff has satisfied the requirements for Article III standing.

Similarly, the Court finds that Plaintiff has met each of the prudential requirements. Plaintiff does not set forth a "generalized grievance." Instead, Plaintiff's suit concerns a specific provision in a specific contract in which it is one of the contracting parties. This controversy falls squarely within the "zone of interests" of the statute at issue, as Plaintiff has been, and if it prevails, will be, a party to the pending government contract. If it loses, it will not contract with Houston due to the statute. Finally, Plaintiff is clearly asserting its own legal rights, not those of a third party. Therefore, Plaintiff has satisfied the prudential requirements of standing.

Defendant makes two specific standing arguments, but only as to certain claims made by the Plaintiff. Defendant argues that (1) Plaintiff lacks standing to seek any relief involving any contracts beyond its own; and (2) Plaintiff lacks standing to bring vagueness and overbreadth claims. The Court will analyze each argument in turn.

1. *Other Contracts*

Defendant concedes that Plaintiff has suffered, or is about to suffer, an injury as a result of the loss of its contract with Houston, and it impliedly concedes that the loss of the contract is fairly traceable to Chapter 2271 (Hassouna testified the contract in question generated between $150,000 and $300,000 annually for A&R). *See* (Doc. No. 31, p. 44–45). Defendant argues, however, that Plaintiff lacks standing to seek a statewide injunction because its injury is the loss of a single

contract with Houston, and thus an injunction applied to other contracts is beyond the scope of redressing Plaintiff's injury. Plaintiff points out that statewide injunctions against state laws that are being challenged as unconstitutional have existed for nearly a century. *See Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 28 U.S. 510 (1925). First, Plaintiff clearly has standing to assert rights concerning its own contract. Second, Texas is really attacking the scope of the requested injunction, not Plaintiff's standing to sue. Furthermore, because the alleged injury is directly attributable to a statute with statewide application, it is entirely possible that Plaintiff could suffer the same injury in other contracts with government entities. As such, Plaintiff has standing to request a statewide injunction.

### 2. *Vagueness and Overbreadth*

Texas next argues that Plaintiff lacks standing to challenge Chapter 2271's incorporation of the definition of "Boycott Israel" that is found in § 808.001 as being both overbroad and vague because Plaintiff has not established an injury due to the law's alleged vagueness. In its Motion for Preliminary Injunction, Plaintiff has pleaded that the "residual clause" in the definition of "Boycott Israel" is vague. (Doc. No. 7-2, at 12–13). The parties have labeled the emphasized portion below the residual clause:

> "Boycott Israel" means refusing to deal with, terminating business activities with, or *otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory*, but does not include an action made for ordinary business purposes.

Texas Gov't Code § 808.001(1) (emphasis added).

Importantly, Defendant contends that Plaintiff has no injury stemming from the allegedly vague portion because Plaintiff's actions are clearly covered by the terms "refusing to deal with"

13

or "terminating business activities with" Israel or person or entity doing business in Israel.[5] This concession makes clear that there is no general dispute as to this Court's jurisdiction over the matter. In other words, Defendant concedes that a case or controversy exists with respect to the "refusing to deal with" or "terminating business activities with" Israel or with a person or entity doing business in Israel, and that the statute applies to Plaintiff. Since Plaintiff has standing, this Court clearly has jurisdiction. Moreover, the Plaintiff has not limited its action to that which might violate the exact wording of the contract. Texas seems to make this assumption merely from the contract language. Plaintiff's contentions include § 808.001, which contains the definitions that are incorporated by reference into both Chapter 2271 and the proposed contract. Further, applicable Supreme Court precedent demonstrates that since Plaintiff generally has standing, Plaintiff has standing to challenge the vagueness and overbreadth of the statute. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Litigants . . . are permitted to challenge a statute not because their own rights of free speech are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others . . . to refrain from constitutionally avoided protected speech or expression.").

The Court finds that Plaintiff has Article III standing to bring this action.

### III.    Ripeness

Before reaching the merits of the case, the Court must also evaluate whether this case is ripe for adjudication. "Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (internal quotation and citation omitted). "Where the inevitability of the operation of a statute

---

[5] Plaintiff does not agree with the manner in which Texas cabins its claims.

14

against individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974) (citing *Pennsylvania v. West Virginia*, 262 U.S. 553, 592–93 (1923) ("One does not have to await the consummation of a threatened injury to obtain preventative relief. If the injury is certainly impending, that is enough.")).

It is true that Plaintiff has not yet formally signed the contract with Houston, and consequently, has not formally been restricted by the terms of such contract. It is also true, however, that Plaintiff and Houston are fully prepared to renew the contract and continue the work Plaintiff has done for Houston for several years prior. It stands to reason, then, that absent any preventative relief, the injury is certainly impending, and this case is ripe to be decided. Texas's Motion to Dismiss (Doc. No. 17) is denied.

## IV.    Is a Boycott Speech?

The question at the forefront of this action is simple: Is boycotting Israel speech? The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. While the First Amendment only explicitly applies to the federal government, it has been applied to the states through the incorporation doctrine of the Fourteenth Amendment. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 822 (1995). Furthermore, the Supreme Court "has recognized that First Amendment protection extends to corporations." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010).

When interpreting the First Amendment, courts have "long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). When the conduct in question is not literally spoken or written speech, courts ask whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the

message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410–411(1974). In other words, the First Amendment only protects speech that is "inherently expressive." *Rumsfeld v. F. for Acad. & Institutional Rts. Inc.*, 547 U.S. 47, 66 (2006) (hereinafter "*FAIR*").

Purely economic conduct, such as "refusing to deal with" or "terminating business relationships with" Israel, is clearly not *literally* spoken or written speech. Rather, the question is whether "refusing to deal with, terminating business relations with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations" with Israel—as the applicable definition reads—constitutes "inherently expressive" conduct. Plaintiff relies on *NAACP v. Claiborne Hardware Co.* to contend that boycotting Israel qualifies as speech. 458 U.S. 886 (1982). The lawsuit in *Claiborne* centered around a boycott of white businesses in Mississippi by black citizens and other civil rights protestors, organized by the National Association for the Advancement of Colored People ("NAACP"). *Id.* at 889. The boycott was initiated after local government officials refused to institute certain changes, and the purpose of the boycott was to achieve "racial equality and integration." In addition to boycotting various white-owned businesses, it employed tactics such as meetings, speeches, and nonviolent picketing. *Id.* at 907 ("The boycott was supported by speeches and nonviolent picketing. Participants repeatedly encouraged others to join in its cause. Each of these elements of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments."). In reviewing the tactics used by the boycott, the Supreme Court held that "the boycott clearly involved constitutionally protected activity." *Id.* at 911.

Plaintiff claims an economic boycott of Israel—or at least the right to do so in the future—mirrors that of the non-violent boycott in *Claiborne*. Plaintiff argues that an economic boycott of

Israel is political speech concerning a public issue like that of the NAACP boycott, and therefore "rest[s] on the highest rung of the hierarchy of First Amendment values." *Id.* at 913.

In response, Defendant relies on *FAIR* to contend that boycotting Israel does not amount to speech under the First Amendment. 547 U.S. 47 (2006). In *FAIR*, the Supreme Court addressed a challenge to the Solomon Amendment, enacted by Congress to prevent law schools from restricting access of military recruiters to their students based on disagreement with the "Don't Ask, Don't Tell" policy. *Id.* at 51. The amendment conditioned the provision of certain federal funds earmarked for the colleges involved on the ability for military recruiters to freely enter campus, as the colleges permitted other employers to do. *Id.* This amendment was challenged by a coalition of law school professors and law schools. *Id.* The challenging law schools argued that the amendment, via "forced inclusion," infringed on their freedoms of speech and association pursuant to the First Amendment. *Id.* at 53. The *FAIR* Court held that the conduct regulated by the Solomon Amendment was "not inherently expressive" and was therefore not protected by the First Amendment *Id.* at 66. The Court explained that prior to the Solomon Amendment, the law schools expressed their disagreement by treating military recruiters differently than other recruiters. *Id.* The Court reasoned, however, that "these actions were only expressive because the law schools accompanied their conduct with speech explaining it." *Id.* The Court noted that if the conduct requires explanatory speech, that is "strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection" as symbolic speech.

Based upon *FAIR*, Defendant concludes that the conduct prohibited in Chapter 2271 is similar to that of the conduct prohibited in *FAIR* by the Solomon Amendment, contending that an economic boycott, without accompanying explanatory speech, does not amount to "inherently expressive" conduct.

The Court agrees that engaging in a boycott of Israel composed of purely economic conduct is "expressive only if it is accompanied by explanatory speech." With respect to this case, like in *FAIR*, it would be difficult, if not impossible, for someone to realize Plaintiff was engaged in a boycott simply based on the conduct prohibited by the statute. It would require an individual to specifically publicize the absence of Israeli products at Plaintiff's office or amongst Plaintiff's work materials. Even if a person were observant and knowledgeable enough to recognize the absence of any Israeli products, it would not be clear that the absence was due to a boycott without some explanatory speech. Instead, the observer may attribute the lack of Israeli products to a number of other ordinary business purposes such as familiarity with product, price, quality disparities, etc. *See e.g., Arkansas Times LP*, 362 F. Supp. 3d at 624. Despite Hassouna's testimony to the contrary, A&R pleads that its boycott "has not materially affected its business decisions to the present." (Doc. No. 1, p. 8). Consequently, no one would know of its boycott, absent additional speech. In short, the Court agrees that the mere refusal to engage in a commercial/economic relationship with Israel or entities doing business in Israel is not "inherently expressive" and therefore does not find shelter under the protections of the First Amendment.

Unfortunately for Defendant, that is not all that the statute prohibits. Defendant argues that the statute, as written, prohibits only the economic boycott of Israel or Israeli entities, and that it does not prohibit speech advocating for boycotts or condemning Israel. (Doc. No. 18, at 17) (explaining that Plaintiff is "free to speak out against Israel in any way"). If the statute were written as the Defendant describes it, Defendant's arguments might prevail; but it is not.

Chapter 2271's definition of "Boycott Israel," incorporated by reference from § 808.001 of the Texas Government Code, does not simply include "refusing to deal with" or "terminating business activities with" Israel or Israeli entities. (Doc. No. 7-2, at 16). That definition includes

what might be described as "typical boycott" language, but it then continues with what the parties have labeled the "residual clause."[6] The residual clause of the "Boycott Israel" definition includes, as earlier emphasized, "otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations" with Israel or Israeli entities. (*Id.* at 16–17); *see also* Tex. Gov't Code § 808.001. Chapter 2271 incorporates by reference the entirety of the definition of "Boycott Israel" that is found in § 808.001 of the Texas Government Code. Plaintiff argues that Chapter 2271 is void for vagueness as a result of this clause, because actions "intended to penalize" or "inflict economic harm on" Israel encompass acts of pure political speech that are protected by the First Amendment, or it is void for vagueness because its breadth is undecipherable. (Doc. No. 7-2, at 16).

In response, Defendant argues that three separate canons of statutory construction—*noscitur a sociis*, *ejusdem generis*, and the canon of constitutional avoidance—make clear that the meaning of the residual clause refers to "economic conduct similar to its predecessor terms 'refusing to deal with' or 'terminating business activities' with Israel." (Doc. No. 18, at 23).

Under the *noscitur a sociis* canon, "a word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015). This canon is employed to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Id.* While it is clear that the residual clause refers to actions related to economic or commercial harm, it is difficult, if not impossible, to see how "any action" is limited to conduct outside the purview of the First Amendment. The presence of the residual clause—and the use of the phrase "any action"—suggests that the Legislature intended the breadth of the Act to extend beyond merely "refusing to deal with" or "terminating business activities

---

[6] The Court finds it expedient to use this descriptor, too.

with" Israel. Therefore, this argument is unpersuasive.

Under the *ejusdem generis* canon, "where general words follow an enumeration of specific terms, the general words are read to apply only to other items like those specifically enumerated." *United States v. Kaluza*, 780 F.3d 647, 660–61 (5th Cir. 2015). Texas argues that one utilizing this precept would interpret "any action" as including actions similar to those already enumerated: "refusing to deal with" and "terminating business relationships with." In short, "any action" would "refer only to commercial activity (or inactivity) akin to not economically engaging with Israel." *Arkansas Times LP*, 988 F.3d at 464. To lend support to this interpretation, Defendant identifies examples of conduct that might be prohibited under the residual clause, including "intentionally raising prices on items shipped to Israel, refusing to ship products to Israel, and similar conduct." (Doc. No. 18, at 23).

Even interpreting the wording in this way, the residual clause is still fatally flawed. "[A]ny action intended to penalize, or inflict economic harm on" Israel is exceptionally broad, even when only applied to economic activity. First, "any action" is left undefined. Second, actions intended to penalize or inflict economic harm on Israel could include conduct protected by the First Amendment, such as giving speeches, nonviolent picketing outside Israeli businesses, posting flyers, encouraging others to refuse to deal with Israel or Israeli entities, or sponsoring a protest which encourages local businesses to terminate business activities with Israel. Each of these actions might be intended to penalize or inflict economic harm on Israel or Israeli entities, and each of these activities falls under the protective shield of the First Amendment. *See, e.g.,* *Claiborne*, 458 U.S. 886.

A reading of the plain language of Chapter 2271 finds that it not only prohibits Plaintiff from refusing to deal with Israel or terminating business relationships with Israel, but that it also

prohibits Plaintiff from doing *anything* that is intended to economically harm Israel. This includes constitutionally protected conduct. A plain reading of the actual wording of the definition of "Boycott Israel" demonstrates that Defendant's contention that Plaintiff would be free to speak out against Israel in *any* way it chooses is not accurate.

Finally, Defendant argues that the canon of constitutional avoidance requires that "when statutory language is susceptible to multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). "[C]onstitutional avoidance 'comes into play when, after the application of the ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Id.* at 842 (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). This Court has followed this principle in many cases; however, absent ambiguity, it has no application. *Warger v. Shauers*, 574 U.S. 40, 50 (2014).

It is true that if "fairly possible," the Court must attempt to construe the statute so as to render it constitutional. *Crowell v. Benson*, 285 U.S. 22, 62 (1932). Importantly, however, the Court "cannot rewrite the statute to be what it is not. Although [courts] will often strain to construe legislation so as to save it against constitutional attack, [they] must not and will not carry this to the point of perverting the purpose of the statute . . . or judicially rewriting it." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 662 (2012) (Scalia, J., dissenting) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986)) (cleaned up). As enacted, the Court finds that the plain reading of the residual clause provides only one reasonable interpretation. This Court is constrained from re-writing the statute, and as a result, constitutional avoidance has no application.

## V.      Does Chapter 2271 Still Have Application Since A&R Would Be Paid With Taxpayer Funds?

Having concluded that the statute in question covers speech protected by the First Amendment, the next question that must be resolved is whether Texas (or any of its political subdivisions) can put speech restrictions on those that are being paid with taxpayer funds. Although not without exceptions, traditionally, government employees do not give up their First Amendment rights merely because they work for a governmental entity. Government contractors fall under the same First Amendment umbrella as do government employees. *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996); *see also Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004); *Oscar Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378, 383 (5th Cir. 2006). The Supreme Court in *Umbehr* declined to set out different guidelines for government contractors as opposed to governmental employees. 518 U.S. at 684–85. It concluded that, in resolving First Amendment challenges, both government employees and contractors should be evaluated under the test set out in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). *Umbehr*, 518 U.S. at 684–85.

In *Umbehr*, the Supreme Court held that courts, in resolving this dilemma, should weigh the government's interest in regulating speech against the interest of the contractor to First Amendment protection:

> We therefore see no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the differences between employees and independent contractors. There is ample reason to believe that such a nuanced approach, which recognizes the variety of interests that may arise in independent contractor cases, is superior to a bright-line rule distinguishing independent contractors from employees.

*Umbehr*, 518 U.S. at 678.

Likewise, the Supreme Court has determined that while no person/entity has a right to government benefits, there are some reasons upon which the government may not rely to withhold

such benefits. "It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The Fifth Circuit has emphasized that the primary motivation is not a person's right to patronage; rather, it is the government's duty not to punish people for free speech that is the primary factor. *Kinney*, 367 F.3d at 357. A government contract is treated as a government benefit. *See Umbehr*, 518 U.S at 678–79. Consequently, these principles apply to the proposed contract between A&R and Houston.

As a result, this Court is called upon to balance A&R's free speech interests and Texas's interest in regulating that speech. Stated differently, while all citizens enjoy the protections of the First Amendment—and while the government has no legitimate interest in repressing an ordinary citizen's viewpoint on matters of public interest—in cases concerning public employees or contractors, courts must be attentive to "'[t]he government's interest in achieving its goals as effectively and efficiently as possible,' which interest 'is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.'" *Kinney*, 367 U.S. at 358 (quoting *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion)).

Neither the governmental interests of Texas nor the exact free speech concerns of Plaintiff are well-developed in the record before the Court. It is not clear, due to inconsistencies between the Complaint and Hassouna's testimony, whether A&R has ever boycotted any person, business, or country. Regardless, Hassouna did testify that he wanted to preserve A&R's right to do so in the future. Thus, A&R's stake rests on some nonmaterial actions it may or may not have taken in the past, and on some vague notion that it may want to boycott in the future.

That notion, however, is not without some support in the record. Hassouna hails from the Gaza Strip, an area which Israel controls externally and over which Hamas exercises internal

control. This has been a geographic hot spot for some time. It is not surprising that Hassouna has personal feelings concerning the current and future status of the Gaza Strip. He and his family have attended protests in support of Palestinian rights and the rights of those located in the Gaza Strip.[7] Hassouna owns A&R outright, and that being the case, it is certainly reasonable to conclude that he has the ability to control where and how his company acts. It is also reasonable to conclude that since he does control A&R, and since he has personally boycotted Israel, A&R might (if it does not already) boycott Israel as well. While this Court cannot—and will not—comment one way or the other on the accuracy of the facts underlying his beliefs (that has never been a criterion for the application of the First Amendment), the Court does find that Hassouna authentically holds a pro-Palestinian point of view that is protected by the First Amendment.

Texas's interests, not surprisingly, are less personal.[8] Texas has, for the last few years, been actively courting business with Israel. There are major Israeli companies currently operating in Texas in many important industries, including the areas of aerospace and petroleum/petrochemicals. They employ Texans and contribute to the overall economy. Secondary sources peg the amount of contribution between 2011 and 2019 to exceed $260 million and the creation of almost 900 jobs. *Israel FDI & Trade with Texas*, TEX. ECON. DEV. CORP., https://businessintexas.com/foreign-investment/israel/. The Governor of Texas has recently traveled to Israel on an economic development mission. *Id.*

Texas also has an interest in ensuring the wellbeing of its Jewish population. Jews have been an integral part of the fabric of Texas since the days of the Republic. The Jewish population

---

[7] Hassouna testified that he is also personally boycotting Venezuela.

[8] The record is almost silent as to Texas's specific interest, so the Court has had to discern those for itself. While these interests are not developed in the record, this aspect is not critical since the Court is finding those interests do not outweigh Plaintiff's First Amendment interests.

has grown steadily. In the early twentieth century, many European Jews immigrated to Texas, arriving through Galveston. One source pegs the number of Jewish Texans to be over 175,000. *See Jewish Population in the United States by State*, JEWISH VIRTUAL LIBR., www.jewishvirtuallibrary.org/jewish-population-in-the-united-states-by-state. Texas has a vested interest (as does the United States) in ensuring their safety and preserving their opportunities to live and worship as they please.

This interest has certainly been brought to the forefront by a recent act of anti-Jewish terrorism in North Texas, where a terrorist held a rabbi and members of Congregation Beth Israel hostage. A recent Dallas Morning News—a Texas newspaper with one of the largest circulations—editorial echoed the thoughts of many Texans regarding the need for protecting at-risk segments of our citizenry while reflecting on the attack, explaining that "[i]t matters that we speak up for one another and for those most at risk. American Jews are a tiny fraction of our population, but they are the targets of a disproportionate number of hate crimes, primarily from domestic terrorists, according to federal authorities." Editorial, *What We Can Learn From Colleyville Synagogue Terror Attack*, DALLAS MORNING NEWS (Jan. 16, 2022), https://www.dallasnews.com/opinion/editorials/2022/01/16/what-we-can-learn-from-colleyville-terror-attack/. One hopes that the concerns expressed above are commonly held.

Nevertheless, as widespread as these concerns may be held, and as well-intended as the message may be, that sentiment cannot be used as the basis for the Defendant to restrict First Amendment rights. "[S]peech cannot be restricted simply because it is upsetting or arouses contempt. . . . Indeed, 'the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.'" *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quoting *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515

U.S. 557, 574 (1995)).

The Court has no evidence before it by which to describe or label the speech in which A&R wishes or may wish to engage. The Court does not find either Hassouna's views or Texas's reasons to protect and expand its dealings with Israel to be spurious or false; but, the Court finds the Texas's reasons have little support by actual evidence in the record. Moreover, even if there were copious evidence, the Court finds that the interests voiced by Plaintiff are entitled to the protection of the First Amendment and that Texas's interests are not sufficient to justify curtailing Plaintiff's rights. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964).

The "speech" contemplated by A&R may make some individuals—especially those who identify with Israel—uncomfortable, anxious, or even angry. Nevertheless, speech—even speech that upsets other segments of the population—is protected by the First Amendment unless it escalates into violence and misconduct.

> First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought.
>
> To preserve these freedoms, and to protect speech for its own sake, the Court's First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct. *See Kingsley Int'l Pictures Corp.*, 360 U.S., at 689; *see also Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it"). The government may not prohibit speech because it increases the chance an unlawful act will be committed "at some indefinite future time." *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (*per curiam*). *The government may suppress speech for advocating the use of force or a violation of law only if "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) (per curiam). There is here no attempt, incitement, solicitation, or conspiracy.*

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (emphasis added). Like the record in the

*Ashcroft* case, there is no suggestion of any unlawful activity connected to A&R. Some individuals

or groups might find A&R's conduct (and the message it impliedly sends) to be offensive,

wrongheaded, or indefensible. Others may not. Importantly, though, the popularity of a message

has never been the touchstone of the First Amendment.

> If there is a bedrock principle underlying the First Amendment, it is that the
> government may not prohibit the expression of an idea simply because society finds
> the idea itself offensive or disagreeable. *See, e.g., Hustler Magazine, Inc. v. Falwell,*
> 485 U.S., at 55–56; *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S.
> 789, 804 (1984); *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 65, 72
> (1983); *Carey v. Brown,* 447 U.S. 455, 462–463 (1980); *FCC v. Pacifica
> Foundation,* 438 U.S., at 745–746; *Young v. American Mini Theatres, Inc.,* 427
> U.S. 50, 63–65, 67–68 (1976) (plurality opinion); *Buckley v. Valeo,* 424 U.S. 1, 16–
> 17 (1976); *Grayned v. Rockford,* 408 U.S. 104, 115 (1972); *Police Dept. of Chicago
> v. Mosley,* 408 U.S. 92, 95 (1972); *Bachellar v. Maryland,* 397 U.S. 564, 567
> (1970); *United States v. O'Brien,* 391 U.S. 367, 382 (1968); *Brown v. Louisiana,*
> 383 U.S., at 142–143; *Stromberg v. California,* 283 U.S., at 368–369.

*Johnson,* 491 U.S. at 414. The BDS movement that the principal of A&R supports may be

unpopular in some circles; it may be considered reasonable in others. Regardless, the popularity

of its message has no bearing on A&R's freedom to voice it should it choose to do so.

In sum, the First Amendment protects all points of view on this issue, even if they do not

comport with the economic goals of this State. Moreover, the projected actions of Plaintiff (at least

based upon the minimal record before this Court) are not calculated to undermine the economic

interests of Texas or to pose a threat to its Jewish citizens. There is no proof, nor even a strong

contention, that any action Plaintiff might take would affect Texas's relationship with Israel.

Furthermore, Hassouna denies any anti-Semitic intent and testified that he (and one presumes

A&R as well) makes a distinction between the actions of individuals who are Jewish and the

actions of the Israeli government. This distinction is the same one voiced by the State Department

and some Jewish groups as noted above. Consequently, to the extent one is concerned about the

wellbeing of Texas's Jewish population, the Court does not find that Plaintiff's boycott, if indeed

it ever happens, is calculated to harm Texas's Jewish population.

> As the Supreme Court has made clear, however, the relevant issue is not the weight of the governmental interest considered in abstract terms; we look instead to how the speech at issue *affects* the government's interest in providing services efficiently. It is the speech's detrimental effect on the efficient delivery of public services that gives the government a legitimate interest in suppressing it.

*Kinney*, 367 F.3d at 362 (emphasis in original). The Court finds that the effect of Plaintiff's protected speech on any service provided by either Defendant is minimal at most. No witness has predicted any disruption to the interests of Texas or Houston that might be attributable to A&R.[9] Therefore, the Defendants do not have a legitimate interest that outweighs the Plaintiff's First Amendment rights.

To summarize, the Court finds Plaintiff has First Amendment rights that would be violated if it is forced to sign the City of Houston contract as it is currently drafted with the Anti-Boycott of Israel (§ 2271.002) language in it (as found in § 2.19.1 of the proposed contract).

## VI.     Preliminary Injunction

The remaining issue is whether this Court will issue an injunction and, if it does, the breadth of such injunction. The elements of an injunction in this Circuit are well established. The movant must prove (1) it is likely to succeed in the lawsuit, (2) irreparable injury, (3) the threatened injury outweighs any damage the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir. 2014).

A. Likelihood of Success

This Court, in its above discussion, has detailed why it finds that Plaintiff will likely prevail

---

[9] Even if one makes a reasoned guess at the most likely path a potential A&R boycott might follow, the most likely aspect would be a refusal to buy Israeli goods or services. Even this path seems unlikely, as it may be prohibited by other provisions in the contract. (*See* Doc. No. 7-1, at 58, Exhibit H, ¶ 2).

in this lawsuit. It finds no need to repeat that discussion here.

B. Irreparable Injury

In the case of the loss of any rights generated by the First Amendment, irreparable injuries are basically presumed. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Clearly, once lost, no one can restore those rights retroactively. Moreover, if this injunction does not issue, A&R will not be able to continue to work with the City of Houston and will lose hundreds of thousands of dollars in the upcoming year. While monetary losses can be compensated by a judgment, its right to perform the contract will be gone forever. Therefore, the Court finds the element of irreparable injury has been satisfied.

C. Balance of Equities

Unlike some other courts, this Court does not find the law in question was necessarily passed due to illegitimate reasons. Texas has a legitimate economic interest in pursuing its relationship with Israel and it also has an interest in protecting its Jewish residents from discrimination and unwarranted abuse. There is no evidence that either concern applies to A&R or its ownership. Therefore, as discussed above, this Court does not find that the issuance of an injunction will harm either interest. The City of Houston has indicated that it stands ready, willing, and able to contract with Plaintiff as long as it can do so legally. Therefore, this factor favors A&R and the issuance of an injunction.

D. Public Interest

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). This is such an injunction.

## VII.    Conclusion

Given the evidence (or relative lack of evidence), the pleadings, and the prevailing law, the Court finds that the residual clause found in the definition of "Boycott Israel" located in § 808.001 of the Texas Government Code—as incorporated by reference into Chapter 2271—violates the rights of Plaintiff and, in essence, precludes it from exercising its First Amendment rights. Therefore, an injunction is appropriate.

The Court, however, is quite concerned about the lack of a developed record, the level of the briefing, and the other actual restrictions that the contract contains (and to which Plaintiff not only has *not* objected, but has, in fact, agreed to in the past). Given all those factors, the Court is not convinced that, on this record, a statewide injunction is appropriate, and further finds it unnecessary to give relief to persons other than Plaintiff. Therefore, in a separate injunction order, this Court will enjoin the State of Texas and the City of Houston from including the provisions of Chapter 2271 of the Texas Government Code (as found in § 2.19.1 of the proposed contract) in the contract currently being tendered to Plaintiff.

All other pending motions are denied.

Signed at Houston, Texas, this 28th day of January, 2022.

Andrew S. Hanen
United States District Judge